STATE v. BLAIR HOVIS.

(Filed 28 March, 1951.)

**1. Criminal Law §§ 52a (2), 52b—**

On demurrer to the evidence or motion for a directed verdict of not guilty, neither the weight nor the reconciliation of the evidence nor the credibility of the witnesses is for the court, but the court is required to determine only whether there is sufficient evidence, considered in the light most favorable to the State, to support a verdict for the prosecution.

**2. Criminal Law § 52a (4)—**

Contradictions and discrepancies in the State's evidence, even though some of them relate to testimony of exculpatory statements made by defendant, do not justify nonsuit when other evidence of the State, includ-

ing inculpatory statements made by defendant, tend to establish the State's case, the reconciliation of the evidence being the function of the jury alone.

**3. Criminal Law § 81b—**

Where the charge is not in the record it will be assumed that the court correctly charged the jury.

**4. Homicide § 25—Evidence held sufficient to support verdict of guilty of involuntary manslaughter.**

Deceased was fatally shot while in a room alone with defendant. The State offered evidence of threats made by defendant against deceased a short time before the fatal shooting. The State also offered in evidence testimony of statements made by defendant to the effect that he and deceased were "fooling" with defendant's pistol, when it went off inflicting the fatal injury, and of later statements made by defendant to the effect that deceased had threatened to kill herself if defendant would not give her more beer, and that at the critical moment had the gun to her chest when defendant attempted to stop her, and the gun went off. *Held:* Conceding that defendant's statements may be reconciled, they are nevertheless susceptible to inferences some of which are inculpatory and some exculpatory, and the inculpatory statements together with the other evidence for the prosecution is sufficient to sustain the jury's verdict of guilty of involuntary manslaughter and overrule defendant's demurrer to the evidence and motion for a directed verdict, the reconciliation and credibility of the testimony being the province of the jury.

**5. Homicide § 8a—**

Where one engages in an unlawful and dangerous act, such as handling a loaded pistol in a careless and reckless manner, or pointing it at another, and kills the other by accident, he is guilty of involuntary manslaughter, and no presumption is required to support a verdict of guilty of this offense. G.S. 14-34.

**6. Same—**

Where the unintentional killing of a human being results from an unlawful act not amounting to a felony or from a lawful act negligently done, the offense is involuntary manslaughter.

APPEAL by defendant from *Sharp, Special Judge,* January Term, 1951, of LINCOLN.

Criminal prosecution on indictment charging the defendant with the murder of Mrs. Ruby Bondurant Colbert.

Upon the call of the case for trial, the solicitor announced that he would not prosecute the defendant for murder in the first degree, but would ask for a verdict of murder in the second degree or manslaughter as the evidence might disclose. *S. v. Wall,* 205 N.C. 659, 172 S.E. 216.

It is revealed by the record that on Sunday afternoon, 17 September, 1950, about 4:30 p.m., the deceased was shot in the chest with the defendant's .38 Smith & Wesson pistol and died shortly thereafter. She was

on a couch in the sleeping room of the defendant's "Moonlight Grill" about four miles from Lincolnton on the Maiden Highway when she was shot, with the defendant the only other person in the room at the time.

The defendant came immediately from the bedroom into the main room of the grill, called Amzi Linn, who went back into the bedroom with him. Linn came back out and called Henry Grayson, who returned with him to the bedroom. Grayson says: "When I walked in there this woman was on the bed a-bleeding. She was lying with her head up in the northwest corner of the bed." He further testified that the defendant was running around and around saying, "Get an ambulance, get a doctor, do something. . . . Get an ambulance and the sheriff. . . . He was not drunk or anything like that but he looked like he was scared. . . . He acted like he was scared awfully bad. . . . When I first went into the room, I said, 'What is going on in here?' He (defendant) said they were fooling with an old gun and it went off.

"The Court: Who was fooling with an old gun?

"Witness: Well, I can't say whether he was fooling with it or she was fooling with it. He said they were fooling with an old gun and it went off."

The sheriff testified that Henry Grayson told him on the following Monday that the defendant said, "he was fooling with an old gun and it went off."

On being recalled, the witness Grayson again stated that when he first went into the bedroom, the defendant said: "We was fooling with an old gun and it went off."

The sheriff testified that he found the "pistol with five loaded cartridges and one empty shell . . . near the southeast corner of the bed, about fifteen inches from the foot of the bed. I asked him (defendant) whose gun it was and he said it was his."

Mrs. Nellie Pope, a patron in the grill, said she heard "feet scuffling or something. . . . Then I heard a man's voice cursing and talking loud. He said, 'Damn you' and 'G—— damn you' two or three times, . . . and in two or three minutes I heard something fall. It was just like something heavy fell. It jarred the floor. It was not but just a few minutes until I heard a shot or something that sounded like a shot."

Dr. W. G. Page performed an autopsy on the body of the deceased and testified that in his opinion her death was caused from a bullet passing through her chest; that there were abrasions or ruptures of the skin about the face which "appeared to have been made right at the time of death or shortly thereafter"; that he found a quantity of food and blood in the stomach "which had a marked alcoholic odor"; that in his opinion "the gun was six inches or more from the body when it was fired. . . . I found no smudging either on the clothing of the deceased or on the body

under the clothing. . . . The bullet entered the body about the center of the chest and ranged downward and came out about two inches below the point of entrance and slightly towards the heart side"; that the abrasions on the skin "could have been caused by striking the head against the edge or corner of a door. . . . They could very easily have been inflicted after her death, as much as thirty minutes after death." The indications were that "the wounds were received subsequent to death or at the time of death."

While in jail, the defendant was interviewed by R. W. Turkelson, Special Agent of the State Bureau of Investigation, to whom he stated that the deceased, a divorcee with three children, "had been staying out there and living with him on week-ends," off and on for about three years, and for some time she had appeared rather blue or morose; that she had received a call from her former husband in Florida which had upset her; that on the day in question she had been drinking and came to the kitchen where he was and wanted some more beer; that he told her she had had enough, to which she replied, "all right I will kill myself then"; that as soon as he finished making a sandwich he came to the door of the bedroom and "saw her with the gun up to her chest" and that she again threatened to kill herself; that he called to her, "Ruby don't do that," and reached for the gun; that "as he got his hand over her hand and partly on the gun it went off"; that this excited him and he tried to get her to the hospital and that "he slipped and fell down as he was carrying her out the back door."

The sheriff, on being recalled, quoted the defendant as saying to him on Sunday night, "that Mrs. Colbert had wanted more beer but he would not give it to her and that she got mad and shot herself."

There is further evidence that in December, 1949, the deceased and the defendant were heard fussing at the Moonlight Grill and the defendant threatened to "blow her brains out" if she went away that night.

At the close of the State's evidence, the defendant demurred and moved for a directed verdict. Overruled; exception.

The defendant offered no evidence.

Verdict: Guilty of involuntary manslaughter.

Judgment: Imprisonment in the State's Prison for a term of not less than five nor more than seven years.

Defendant appeals, assigning as error the refusal of the court to dismiss the action as in case of nonsuit or to direct a verdict in his favor.

*Attorney-General McMullan and Assistant Attorney-General Bruton for the State.*

*Childs & Childs and Jonas & Jonas for the defendant.*

STACY, C. J.   The single question presented for decision is the suffi-
ciency of the evidence to overcome the demurrer and to withstand the
motion for a directed verdict.   The rulings of the trial court were favor-
able to the State, and we are disposed to approve.

It is true the evidence is not all one way and it was offered by the
prosecution—the defendant electing not to go upon the witness stand or
to offer any evidence—nevertheless it is the rule with us that on demurrer
to the evidence or motion for directed verdict the State is entitled to
have the evidence considered in its most favorable light, eliminating for
the purpose any discrepancies or contradictions which the jury alone
may reconcile or consider.   *S. v. Rountree,* 181 N.C. 535, 106 S.E. 669.
The court's inquiry on demurrer or such motion is directed to the suffi-
ciency of the evidence to warrant its submission to the jury and to sup-
port a verdict for the prosecution.   *S. v. Hart,* 116 N.C. 976, 20 S.E.
1014.   Neither the weight nor the reconciliation of the evidence nor the
credibility of the witnesses is for the court.   *S. v. Utley,* 126 N.C. 997,
35 S.E. 428.

Then, too, all of the discrepancies and contradictions in the evidence,
if such there be, come from variant statements made by the defendant
to different witnesses.   If these result in ultimate equivocation, the jury
alone is authorized to find the facts or to say what they are, and to assess
their value in the light of the attendant circumstances.   A verdict is the
jury's *veredictum*—the *dictum* of truth, or the pronouncement of the real
truth of the matter.

Here, the defendant is quoted as saying to Henry Grayson that "we
were fooling with an old gun and it went off," meaning he and the de-
ceased were fooling with the gun when it fired, and Grayson quoted the
defendant to the sheriff as saying, "he was fooling with an old gun and
it went off."

On the other hand, the sheriff and the S.B.I. agent quote the defendant
as saying to them that Mrs. Colbert was drinking on the afternoon in
question; that she wanted more beer and he would not give it to her;
whereupon she threatened to kill herself and had the gun up to her chest
when the defendant attempted to stop her and it went off, thus resulting
in a misadventurous homicide.   *S. v. Eldridge,* 197 N.C. 626, 150 S.E.
125; *S. v. Whaley,* 191 N.C. 387, 132 S.E. 6.

Initially, the defendant says there is no real contradiction in his state-
ments to Grayson, the sheriff and the S.B.I. agent; that his statement to
Grayson was made under excitement and on the spur of the moment and
was intended only as a short-hand statement of the occurrence which is
readily reconcilable with his later statements to the sheriff and the S.B.I.
agent.   In the absence of the court's charge to the jury, which does not
appear in the transcript, it is to be assumed the court correctly instructed

the jury to reconcile the evidence, where reasonably susceptible of reconciliation, and thus the defendant presumably was given full benefit of his position in this respect in the jury's consideration of the evidence.

Moreover, taking the State's view of the different statements, the defendant says the record presents this question: Where the State offers contradictory statements of the defendant, some initially made which are inculpatory and others later made which are exculpatory, is the State bound by the later statements thus entitling the defendant to a dismissal of the action?

An affirmative answer is urged by the defendant. He contends that "it is neither charity nor common sense nor law" to permit a jury to infer a criminal occasion when the State's evidence, with equal or greater certainty, points to accident or misadventure as the cause of decedent's death, *S. v. Massey,* 86 N.C. 658, and that a compulsory nonsuit or dismissal of the prosecution on demurrer to the evidence is suggested, if not required, by the following authorities: *S. v. Ray,* 229 N.C. 40, 47 S.E. 2d 494; *S. v. Watts,* 224 N.C. 771, 32 S.E. 2d 348; *S. v. Boyd,* 223 N.C. 79, 25 S.E. 2d 456, and cases cited; *S. v. Todd,* 222 N.C. 346, 23 S.E. 2d 47, and cases cited; *S. v. Cohoon,* 206 N.C. 388, 174 S.E. 91.

While defendant's counsel have presented his case cogently and with much force, we are constrained to think the record, viewed as a whole, hardly pushes the prosecution into this position. There is the evidence of Mrs. Nellie Pope and the attendant circumstances, including the defendant's previous threat to kill the deceased, which would seem to bring the case within the principle announced in *S. v. Phillips,* 227 N.C. 277, 41 S.E. 2d 766, and *S. v. Gregory,* 203 N.C. 528, 166 S.E. 387. The probative value of the evidence is for the twelve. The solicitor felt impelled to give the jury the benefit of all the evidence and to "let the chips fall wherever they may." An adverse answer to the question, however, may be found in *S. v. Robinson,* 229 N.C. 647, 50 S.E. 2d 740, and *Jackson v. Hodges,* 232 N.C. 694, *loc. cit.* 696, 62 S.E. 2d 326.

Finally, the defendant says there is nothing on the record to show an intentional killing on his part; that the jury has so found, and that no adverse presumption arises to overcome the presumption of innocence, or to support the verdict of involuntary manslaughter. *S. v. Cranford,* 231 N.C. 211, 56 S.E. 2d 423; *S. v. Harvey,* 228 N.C. 62, 44 S.E. 2d 472; *S. v. Edwards,* 224 N.C. 577, 31 S.E. 2d 762; *S. v. Smith,* 221 N.C. 400, 20 S.E. 2d 360; *S. v. Godwin,* 227 N.C. 449, 42 S.E. 2d 617. And further, that his statements to the several witnesses, which were offered as worthy of belief, clearly reveal in their entirety, *S. v. Edwards,* 211 N.C. 555, 191 S.E. 1, an accidental homicide or a self-inflicted lethal injury. *S. v. Coffey,* 228 N.C. 119, 44 S.E. 2d 886; *S. v. Penry,* 220 N.C. 248, 17 S.E. 2d 4; *S. v. Shu,* 218 N.C. 387, 11 S.E. 2d 155; *S. v. Montague,* 195 N.C.

20, 141 S.E. 285; *S. v. Tillman,* 146 N.C. 611, 60 S.E. 902; *S. v. Goodson,* 107 N.C. 798, 12 S.E. 329. Again, we must refer to the absence of the charge from the transcript and assume the defendant's position in these respects was adequately explained to the jury. Evidently the defendant desires or craves complete vindication or nothing. No presumption is required to support a verdict of involuntary manslaughter, where the evidence permits such an inference. *S. v. Coble,* 177 N.C. 588, 99 S.E. 339; *S. v. Stitt,* 146 N.C. 643, 61 S.E. 566. Where one engages in an unlawful and dangerous act, such as "fooling with an old gun," *i.e.,* using a loaded pistol in a careless and reckless manner, or pointing it at another, and kills the other by accident, he would be guilty of an unlawful homicide or manslaughter. G.S. 14-34; *S. v. Vines,* 93 N.C. 493; *S. v. Trollinger,* 162 N.C. 618, 77 S.E. 957; *S. v. Limerick,* 146 N.C. 649, 61 S.E. 568.

Involuntary manslaughter has been defined to be, "Where death results unintentionally, so far as the defendant is concerned, from an unlawful act on his part not amounting to a felony, or from a lawful act negligently done." 1 Wharton Cr. Law, Sec. 305; *S. v. Williams,* 231 N.C. 214, 56 S.E. 2d 574; *S. v. Stansell,* 203 N.C. 69, 164 S.E. 580; *S. v. Turnage,* 138 N.C. 566, 49 S.E. 913. Of course, nothing said herein militates in any way against the doctrine upheld in *S. v. Horton,* 139 N.C. 588, 51 S.E. 945; *S. v. Satterfield,* 198 N.C. 682, 153 S.E. 155, and other cases, of a misadventurous homicide.

After a searching investigation of the record and with full appreciation of the forceful argument of defendant's counsel, we are constrained to approve the submission of the case to the jury. Hence, on the record as presented, the verdict and judgment will be upheld.

No error.