STATE v. ALFRED KNIGHT.

(Filed 5 March, 1958.)

1. **Criminal Law § 53—**

It is proper for a medical expert witness to testify upon proper hypothetical questions, or from his own personal examination of the body of the deceased, as to the cause of death.

2. **Same: Criminal Law § 155—If part of answer is unresponsive to question motion must be made to strike unresponsive part.**

The evidence tended to show that the body of deceased was found shortly after an altercation and scuffle between the deceased and defendant. There was medical expert testimony to the effect that no injury was found on the body of deceased sufficient to have caused death. A medical expert was permitted to testify over objection upon proper hypothetical questions and from his own knowledge gained from a complete autopsy that the cause of death was the cessation of heartbeat resulting from fear, anger and severe exertion during the fight. *Held:* It was competent for the medical expert to testify as to the cause of death, and if part of the answers to the hypothetical questions were incompetent for the reason that the witness drew an inference from the assumed facts that deceased experienced fear and anger and used severe exertion during the fight, the absence of motion to strike such part in one instance waived any ground of objection and rendered harmless the failure to strike such portions of the other answers upon motion duly made.

3. **Criminal Law § 159—**

An assignment of error not set out in the brief is deemed abandoned. Rule of Practice in the Supreme Court No. 28.

4. **Criminal Law § 162—**

The exclusion of testimony on cross-examination cannot be held prejudicial when the record fails to show what the witness would have testified if permitted to answer.

5. **Homicide § 3—**

If a person dies as a result of shock or fright directly resulting from an unlawful battery committed by defendant, defendant is guilty of

criminal homicide even though the injuries inflicted would not of themselves have produced death.

**6. Homicide § 25—Evidence held sufficient to raise reasonable inference that death resulted from shock or fright caused by assault.**

Evidence to the effect that defendant was the aggressor and unlawfully and violently assaulted deceased, that deceased died shortly thereafter from cessation of heartbeat, and that he was in good health prior to the assault, is sufficient to be submitted to the jury in a homicide prosecution and sustain conviction of defendant of involuntary manslaughter, even though there is evidence that there was no traumatic injury upon the body of deceased which could have caused death, since upon the evidence the jury could reasonably draw an inference that deceased's death from cessation of heartbeat was directly caused by shock or fright or exertion attendant defendant's violent and unjustifiable battery upon him, and that deceased would not have died except for such unlawful assault and battery.

APPEAL by defendant from *Huskins, J.,* November Criminal Term 1957 of GASTON.

Criminal prosecution on a bill of indictment charging the defendant with murder in the first degree of Ronnie Leonard Ramsey.

When the case was called for trial the Solicitor for the State announced that he would not seek a conviction for first degree murder, but the defendant would be tried for second degree murder or manslaughter, as the evidence would justify.

The defendant pleaded Not Guilty. The jury returned a verdict of guilty of involuntary manslaughter.

From a judgment of imprisonment, the defendant appeals.

*George B. Patton, Attorney General, and Harry W. McGalliard, Assistant Attorney General, for the State.*
*William N. Puett for defendant, appellant.*

PARKER, J. The defendant has eight assignments of error: six as to the admission of evidence, one as to the rejection of evidence, and another as to the failure of the court to allow defendant's motion for judgment of nonsuit made at the close of the State's evidence. The defendant offered no evidence.

About 10:30 p.m. on 3 November 1957 Ronnie Leonard Ramsey, a 16-year-old boy, and Victor Davis, a 14-year-old boy, left a moving picture show, and went to Bum's Corner in the City of Gastonia to thumb a ride home. Some ten minutes later Alfred Knight, the defendant, James Ertzberger, a 16-year-old boy and Olin Rushton, a 13-year-old boy, came to the same corner to thumb a ride.

This in substance is the testimony of Victor Davis as to what occurred there: After the defendant, James Ertzberger and Olin

Rushton were there a few minutes, Olin Rushton threw three or four rocks at Ronnie Leonard Ramsey and Victor Davis. Ramsey said to Rushton, "you'd better not hit us." Whereupon, Knight, Ertzberger and Rushton came up to Ramsey and Davis, and asked Ramsey what he had said. Ramsey replied, "you'd better not hit us" and "I'm not afraid of any of you." The defendant said, "I'll make you afraid of me," grabbed Ramsey, and gave him a shove. Then Ramsey hit the defendant in the face. There was a scuffle, and Ramsey and the defendant fell to the ground, with Ramsey landing on his stomach, and the defendant on top and straddle him. While they were in that position, the defendant hit Ramsey twice on the back of his head. Davis at that time left to seek the police. When he returned some ten minutes later, Ramsey was lying doubled up in a ditch. The defendant and his two companions were gone. A crowd had gathered.

This is the substance of James Ertzberger's testimony: The defendant told Rushton to throw a rock at Ramsey, which he did. Before this Ramsey had said nothing to the defendant. Rushton threw other rocks. Ramsey told them to stop throwing rocks at him. Rushton said to the defendant, "let's go up there." All three did. Ramsey again told them to stop throwing rocks at him, and he was not afraid of any of them. The defendant said to Ramsey, "I can make you afraid of me." Ramsey smiled, and turned away. The defendant pushed Ramsey, who hit him in the mouth. The defendant then knocked Ramsey down, and got on top of him. Ramsey was lying on his stomach with the defendant straddle of him. The defendant held the knuckles of his hands in Ramsey's temples, and then hit Ramsey three licks behind his head with his right hand. Ertzberger said to the defendant, "let's go." The defendant got up, kicked Ramsey twice on the top of his head, called him a s. o. b., and then he and his two companions ran off.

The testimony of Olin Rushton is substantially similar to that of James Ertzberger. Rushton testified that just before the defendant assaulted Ramsey by pushing him, Ramsey said, "I'm not scared of nary one of you," and the defendant replied, "I'll teach you to be scared of me."

About 10:45 p.m. on the same night William R. Caldwell, a policeman of the City of Gastonia, went to Bum's Corner in answer to a call for help from Victor Davis. He saw Ronnie Leonard Ramsey lying on his stomach in a ditch with his head to one side. The officer saw three bubbles come out of his mouth. The policeman examined him for a pulse, and found none. His body was carried to a hospital in an ambulance. Ramsey never spoke in the officer's presence.

About 11:20 or 11:30 p.m. on this night Dr. Harry Riddle, an admitted medical expert, saw Ronnie Leonard Ramsey at the Gaston Memorial Hospital. He examined him, and made some X-Rays of him. In his opinion he was dead the first time he saw him. He had a small amount of blood in one nostril, a tiny scratch in that nostril, a small amount of blood in the right ear, and a small scratch at the base of that ear. In the doctor's opinion his skull was not fractured, and he saw no sign that Ramsey had been kicked with a shoe on the head. In Dr. Riddle's opinion he saw no injury on Ramsey which would have been fatal.

Dr. G. W. Belk, an admitted medical expert, testified that he examined Ronnie Leonard Ramsey on 22 October 1957 for an insurance company, and found him in good physical condition.

On 4 November 1957 Dr. William B. Kingsley, an admitted medical expert specializing in pathology, performed, in his words a "very meticulous and complete autopsy" of the dead body of Ronnie Leonard Ramsey. In response to a hypothetical question asked him by the Solicitor for the State, which question contained a full and fair recital of all relevant and material facts already in evidence, and which was properly framed, as to whether he had an opinion satisfactory to himself as to the cause of Ronnie Leonard Ramsey's death, Dr. Kingsley replied that he did. He was then asked what was his opinion. Dr. Kingsley replied as follows: "In my opinion, the severe exertion, the fear, and the anger which the — — Ronnie Ramsey had during the fight caused his heart to stop beating and resulted in his death." Dr. Kingsley was then asked, that if the jury should find the facts to be as stated in the first hypothetical question, did he have an opinion as to whether or not Ramsey's heart would have stopped beating had he not been subjected to that type of exertion, fear, anger and so forth. He replied that he had an opinion. In reply to the question as to what his opinion was, he said: "It would have, in my opinion, taken a situation like this, or similar to this, to have caused the circumstances which resulted in the cessation of heartbeat." This in substance is Dr. Kingsley's testimony on cross-examination: In his post-mortem examination of Ramsey's body he found no abnormalities about this boy's health and condition. However, his lungs were congested. In his opinion there was no traumatic injury sufficient to cause death: no bone fractures and a few small skin lacerations. In his opinion Ramsey's death was not a probable or natural consequence, nor did his death result from blows struck by the defendant. It is a fact that there is no affirmative finding that you can make after death to determine that cessation of heartbeat was the cause of death, unless you are examining the person while dying. He reached his conclusion as to the cause of

death of Ramsey by eliminating all other known causes of death. He had personally examined three deaths of this nature in the past ten years. Fear, exertion and anger are not the only causes, or motivating causes, for cessation of heartbeat. Death can result from cessation of heartbeat where these things are not present. He did not know of his own knowledge, nor did he have any medical method for determining, that Ramsey suffered from fear, fright, anger or exertion on this occasion. He was then asked this question by defendant's counsel: "Doctor, if there is no absolute, positive scientific or medical method for determining that the cause of death is cessation of heartbeat, how can you be so sure that such was the cause of death?" The doctor answered: "Because my very meticulous and complete autopsy revealed no other cause of death." The doctor further testified: "I do not contend that science and medicine know all causes of death at the present time. I do not eliminate the possibility of unknown causes of cessation of heartbeat, or other unknown causes of death. In view of the fact that my findings in this cause of death are negative, there is a possibility of error in it." On redirect examination the doctor testified that, in his opinion, the congestion in Ramsey's lungs found in his examination occurred at the time of his death.

The father of Ramsey testified that he did not know of any illness or sickness of his son prior to his death, nor did he know of any physical disability of his son. He saw his son's dead body that night at the hospital. He had some blood in both nostrils, a little blood in one ear, and seemed to have a bruise on the left side of his face.

The defendant has six assignments of error as to the admission of evidence, all relating to the testimony of Dr. William B. Kingsley. The doctor was asked two hypothetical questions. In reply to each hypothetical question he said that he had an opinion satisfactory to himself, and then he was asked what that opinion was. Four of defendant's assignments of error relate to these two questions: first to the hypothetical questions, and then to the questions as to what his opinion was. A fifth assignment of error is to the failure of the court to strike out one of his answers to one of these questions as to what his opinion was. A sixth assignment of error is to this question asked the doctor by the Solicitor for the State on redirect examination: "Doctor Kingsley, were you able to find anything in the case—Ronnie Ramsey's case that in your opinion caused the cessation of heartbeat other than the fear, fright, exertion and excitement?" Over the defendant's objection and exception, the witness was permitted to answer, and said, "I was not."

Dr. Kingsley was an admitted medical expert specializing in pathology. He testified as an expert witness on the assumption that the jury would find the facts to be as set forth in the hypothetical questions, and also as to matters within his direct, personal knowledge learned by his "very meticulous and complete autopsy" of the dead body of Ronnie Ramsey.

It seems that a jury could draw a reasonable inference from the evidence as to the fight between Ramsey and the defendant, and all the facts in evidence in respect to the fight, that Ramsey had fear and anger, and engaged in severe exertion during the fight. Even though Ramsey said before the fight to the defendant and his two companions, "I'm not scared of nary one of you," that does not necessarily mean that he had no fear after the defendant knocked him down, and was straddle of him, and beating him.

We held in *S. v. Smoak*, 213 N.C. 79, 195 S.E. 72, that a medical expert is competent to testify upon proper hypothetical questions as to the cause of death.

In *S. v. Mays*, 225 N.C. 486, 35 S.E. 2d 494, which was a prosecution for murder, Dr. J. F. Foster examined the body of the deceased and being asked his opinion as to the cause of death he replied, "My opinion is that she died from suffocation from the dress being crammed over her air passages." The Court said: "Foundation was laid for the question which elicited this response. Expert testimony as to the cause of death was competent. Frequently it is the only available means of proving that fact. The question was proper and there was no objection to the answer or motion to strike the part thereof which undertook to give the means used. Defendant waived any grounds for objection to so much of the answer as may not be responsive to the question."

This Court said in *S. v. Bowman*, 78 N.C. 509: An expert's "evidence is competent only when founded on facts within the personal knowledge and observation of the expert, or upon the hypothesis of the finding of the jury." See also *Summerlin v. R. R.*, 133 N.C. 550, 45 S.E. 898.

Even if it be conceded that Dr. Kingsley's answers to the hypothetical questions were incompetent for the reason that he drew an inference from the assumed facts that Ramsey had fear and anger and used severe exertion during the fight with the defendant, yet the admission of such evidence would seem to be harmless, because Dr. Kingsley testified that in his opinion, based on facts within his own personal knowledge disclosed by his "very meticulous and complete autopsy" of the dead body of Ramsey, his death was caused by a cessation of heartbeat caused by fear, anger and severe exertion during the fight. It was

proper for the doctor to give his opinion as to the cause of death from the autopsy he performed, and, as in the May Case, there was no objection to the answer given by the doctor as to his opinion of the cause of death based on his autopsy, or motion to strike the part thereof as to fear, anger and severe exertion.

Dr. Kingsley's testimony as to his opinion of the cause of death based on his autopsy related to matters requiring expert knowledge in the medical field about which a person of ordinary experience would not be capable of forming a satisfactory conclusion unaided by expert testimony from one learned in the medical field. All defendant's assignments of error as to the admission of evidence, and as to the failure to strike out an answer of Dr. Kingsley to a hypothetical question, are overruled.

Defendant's assignment of error as to the rejection of evidence—which is number six in the Record—is taken as abandoned for the reason that it is not set out in his brief. Rule 28, Rules of Practice in the Supreme Court, 221 N.C. 563; *Beasley v. McLamb,* 247 N.C. 179, 100 S.E. 2d 387. Further, the exception to the refusal of the court to permit Dr. Kingsley to answer the question asked by defendant's counsel on cross-examination cannot be sustained, for the reason that the Record fails to show what Dr. Kingsley would have testified, if permitted to answer. *S. v. Poolos,* 241 N.C. 382, 85 S.E. 2d 342.

Defendant's assignment of error to the denial by the court of his motion for judgment of nonsuit challenges the sufficiency of the evidence to carry the case to the jury.

In *Snowden v. State,* 133 Md. 624, 106 A. 5, a conviction for homicide was upheld where the medical testimony was to the effect that the victim, a woman, had died of shock as the result of the injuries inflicted on her by the defendant's assault. These wounds consisted of various surface scratches and lacerations, in addition to a blow on the forehead and some evidence of strangulation.

In *Fisher v. State,* 148 Tex. Crim. 133, 185 S.W. 2d 567, a murder conviction was sustained, where the defendant had shot the victim, although the state's medical testimony was to the effect that the slight wounds in the neck, which were the only injuries to the victim, had not gone deep enough to produce death, and that the victim might have died from shock.

In *Barron v. State,* 29 Ala. App. 137, 193 So. 190, one of the medical witnesses testified that the knife wounds inflicted by the defendant on the victim would not have produced death, but the fight and the stabbing had produced shock, and in the witness's opinion the death was due either to the shock or heart trouble. The murder conviction was upheld, since in either case the de-

fendant was responsible for the death, and it made no difference whether the death had resulted from the cutting of a vital vein or organ, or from shock superinduced by the wound and the fight, or from other natural causes set in motion by the defendant's wrongful act.

In *Cox v. People,* 80 N.Y. 500, the Court said: "It was not necessary in order to convict the prisoner that it should appear that his actual personal violence was the sole and immediate cause of the death of the deceased. If this violence so excited the terror of the deceased that she died from the fright, and she would not have died except for the assault, then the prisoner's act was in law the cause of her death."

This Court said in *S. v. Minton,* 234 N.C. 716, 68 S.E. 2d 844: ". . . the act of the accused need not be the immediate cause of the death. He is legally accountable if the direct cause is the natural result of his criminal act."

It seems to be the general rule, certainly in the modern decisions, that where the fatal shock or fright was directly caused by an unlawful battery committed by the defendant upon the victim inflicting injuries, which in and of themselves would not or might not have produced death, that the defendant is guilty of criminal homicide. Anno. 47 A.L.R. 2d p. 1072, *et seq.,* entitled "Homicide by Fright or Shock"; Anno. Ann. Cases 1912A p. 142, *et seq.,* entitled "Causing Death by Fright as Homicide"; Anno. 16 L.R.A. (N.S.) p. 327, *et seq.,* entitled "Is One Causing Fright by Unlawful Act Guilty of Homicide because Death Follows Fright?"; 40 C.J.S., Homicide, pp. 852-853.

This Court said in *S. v. Hovis,* 233 N.C. 359, 64 S.E. 2d 564: "Involuntary manslaughter has been defined to be, 'where death results unintentionally, so far as the defendant is concerned, from an unlawful act on his part not amounting to a felony, or from a lawful act negligently done.' "

All the evidence shows that the defendant was the aggressor, that he unlawfully and violently assaulted Ronnie Ramsey, and that Ronnie Ramsey was dead a short time after the assault. Although the State offered the evidence of Dr. Harry Riddle that he saw no injury upon Ramsey's body which would have been fatal, yet it offered the testimony of Dr. William B. Kingsley, who performed a "very meticulous and complete autopsy" of Ramsey's dead body, that in his opinion the cause of Ramsey's death was a cessation of heartbeat. The jury could draw a permissible and reasonable inference from the evidence that Ramsey's death resulted not from the injuries themselves inflicted upon him in the unlawful battery, but from a cessation of heartbeat directly caused by shock or fright or exertion, by reason of the defendant's violent and unjustifiable assault and

battery upon him, and that Ramsey would not have died but for the defendant's unlawful assault and battery upon him. The State's evidence was sufficient to carry the case to the jury for it to say how it was. The motion for judgment of nonsuit was properly overruled.

No error.