STATE v. JAMES MADISON HORNER AND WILLIAM GORDY.

(Filed 21 May, 1958.)

**1. Criminal Law § 99—**
   On motion to nonsuit, the evidence must be considered in the light most favorable to the State, giving it every reasonable inference fairly to be drawn therefrom.

**2. Criminal Law § 101—**
   If there is more than a scintilla of competent evidence to support the

allegations in the warrant or indictment, it is the court's duty to submit the case to the jury.

**3. Same—**

When the State's evidence is conflicting, some tending to incriminate and some tending to exculpate the defendant, it is sufficient to repel a motion for judgment of nonsuit, and must be submitted to the jury.

**4. Same—**

The fact that a confession introduced in evidence by the State contains exculpatory statements does not justify nonsuit, since the jury is not compelled to believe the whole of the confession, but may, in their sound discretion, believe a part and reject a part.

**5. Homicide § 3—**

A person is legally accountable if the direct cause of a person's death is the natural result of his criminal act.

**6. Criminal Law § 9—**

When two or more persons aid and abet each other in the commission of a crime, all are principles and equally guilty irrespective of any previous confederation or design.

**7. Same—**

Mere presence, even with the intention of assisting, cannot be said to be aiding and abetting, unless the intention to assist, if necessary, is in some way communicated to the actual perpetrator of the crime.

**8. Criminal Law § 101—**

Circumstantial evidence is an accepted instrumentality in the ascertainment of truth and is sufficient to take the issue of guilt to the jury if it tends to prove the fact in issue or reasonably conduces to that conclusion as a fairly logical and legitimate deduction, and thus raises more than a mere suspicion or conjecture.

**9. Criminal Law § 72—**

In the absence of a charge of conspiracy, incriminating statements made by each defendant not in the presence of the other are competent, respectively, only against the defendant making the statements.

**10. Homicide § 8a—**

Manslaughter is generally divided into voluntary and involuntary manslaughter; involuntary manslaughter is where death results unintentionally, so far as the defendant is concerned, from an unlawful act on his part not amounting to a felony, or from a lawful act negligently done, the killing being without malice.

**11. Homicide § 25— Circumstantial evidence of defendants' guilt of homicide held sufficient to be submitted to the jury.**

The State's evidence tended to show that both defendants and a woman, all highly intoxicated, went to the home of one of the defendants about midnight, where the woman was put to bed, that about 5:00 o'clock the next morning the defendants took the woman to the house of a friend, where more drinks were taken, that while at this house the woman fell

off a cot and groaned, but also that a woman was heard to yell twice for help, with evidence tending to show that the yells came from this house, that about 8:30 in the morning defendants took the woman from the house to a car in the yard, supporting her under her arms, drove about a mile, and put her out on a country road and left her, that the woman was discovered lying in a rut in the road shortly after 2:00 in the afternoon, and that she was taken to the hospital where she died between 3:50 and 4:00 the same afternoon. There was medical expert testimony that deceased had numerous bruises on her body, that death resulted from laceration of her liver and intestine, that the laceration of the liver occurred two to twelve hours prior to death, and that such injury could not likely have resulted from her falling off a cot. There was in evidence, also, a statement by one of defendants, referring to the time they were at the house of the friend, that "that is where it happened." *Held:* The evidence was sufficient to permit, but not to compel, reasonable and legitimate inferences that the death of deceased was the result of a terrible beating, and that if only one defendant beat her, the other was present aiding and abetting in the beating, and therefore was sufficient to be submitted to the jury as to both defendants upon an indictment charging manslaughter. G.S. 15-144.

HIGGINS, J., dissenting.

APPEAL by defendants from *Seawell, J.,* November Criminal Term 1957 of CUMBERLAND.

Prosecution upon a bill of indictment charging the defendants James Madison Horner and William Gordy on 28 September 1957 with feloniously slaying and killing Sarah Moultrie Lindsay.

Both defendants pleaded Not Guilty. The jury returned a verdict that both defendants were guilty as charged.

From judgments of imprisonment of both defendants, both defendants appeal.

*George B. Patton, Attorney General, Claude L. Love, Assistant Attorney General, and R. T. Sanders, Staff Attorney for the State.*
*Nance, Barrington & Collier by: Carl A. Barrington and Rudolph G. Singleton, Jr., for James Madison Horner defendant, appellant.*
*Seavy A. Carroll for William Gordy defendant, appellant.*

PARKER, J.   The State offered evidence. The defendants offered none. Each defendant assigns as error the denial by the court of his motion for judgment of nonsuit made at the close of the State's evidence.

These motions challenge the sufficiency of the State's evidence, considered in the light most favorable to the State, and giving to the State the benefit of every reasonable inference fairly to be drawn therefrom, to carry the case to the jury. *S. v. Kelly,* 243 N.C. 177, 90 S.E. 2d 241.

If there is more than a scintilla of competent evidence to support the

allegations in the warrant or indictment, it is the court's duty to submit the case to the jury. *S. v. Kelly, supra; S. v. Davenport,* 227 N.C. 475, 42 S.E. 2d 686.

When the State's evidence is conflicting—some tending to incriminate and some to exculpate the defendant—it is sufficient to repel a motion for judgment of nonsuit, and must be submitted to the jury. *S. v. Robinson,* 229 N.C. 647, 50 S.E. 2d 740; *S. v. Edwards,* 211 N.C. 555, 191 S.E. 1.

A jury is not compelled to believe the whole of a confession. The twelve are the triers of fact, and may, in their sound discretion, believe a part and reject a part. *S. v. Mangum,* 245 N.C. 323, 96 S.E. 2d 39; *S. v. Henderson,* 180 N.C. 735, 105 S.E. 339; *S. v. Ellis,* 97 N.C. 447, 2 S.E. 525; *S. v. Overton,* 75 N.C. 200.

The State's evidence tends to show the following facts: Between 2:00 and 3:00 o'clock on the afternoon of Saturday, 28 September 1957, Mrs. Margaret Faircloth saw Sarah Moultrie Lindsay, a white woman, lying in a wheel rut in a little sand road some three miles west of the corporate limits of the City of Fayetteville. This road is not maintained by the State. It is a remote woods area. The weather was cold, and it was raining. Mrs. Faircloth stopped her car, got out, walked to where Sarah Moultrie Lindsay was lying in the wheel rut, and asked her who left her there. She raised her head a second or two, and asked for water. Mrs. Faircloth got in her car, drove away, and called the Sheriff's Office in Fayetteville.

About 2:55 p.m. two Deputy Sheriffs from Fayetteville, with Mrs. Faircloth, arrived at the scene. Upon arrival they saw Sarah Moultrie Lindsay lying in a wheel rut in this little sand road. She was alive. The ground around the body was torn up with footmarks and handmarks, and on the ground were three blood spots about 10 feet apart. She had on a dark dress which was up around her waist. She was nude from her waist down. One shoe was off her foot, and about 1½ to 2 feet from a blood spot. The other shoe was on her foot. A woman's purse was lying about 10 feet from her body. She shook her head, and tried to talk, but the officers could not understand her. Her entire chin was bruised black, one eye was swollen and almost closed with a little blood in its corner, her arms were bruised, and she was bloody between her legs. The officers called an ambulance, and sent her to the Cape Fear Hospital, where she died between 3:50 and 4:00 o'clock the same afternoon.

The body of Sarah Moultrie Lindsay, shortly after her death, was sent to the morgue of the North Carolina Memorial Hospital in Chapel Hill, where some 17 to 18 hours after her death Dr. William W. Forrest, held by the court to be a medical expert in the field of pathology, conducted an examination and autopsy of her body. After the clothes were removed from her body, the examination disclosed the following

bruises on her body: a bruise in the front part of the scalp measuring 2½ inches in greatest diameter, a bruise on the left upper eyelid measuring about an inch and extending over the nose with a hemorrhage in the white of the eye, a bruise on the lower lip, a bruise on the chin measuring 2 inches in diameter, 33 bruises on the right arm, 36 bruises on the left arm, a bruise on the left breast 6 inches in diameter, 9 small bruises on the abdomen, 23 bruises on the right leg—the largest of which was 4 inches in greatest diameter, 21 bruises on the left leg —the largest of which was 4 inches. Clotted blood was on her thighs. When the body was opened, about a quart of blood was found in the abdominal cavity that came from a tear in the liver on its bottom front surface measuring 2 inches in length and 2 inches in depth, and from a tear in the large intestine next to the liver. Dr. Forrest testified the liver is the largest organ in the body sitting in the right upper abdomen, and is normally protected by the lower ribs. This woman's liver was a little larger than usual, and it stuck down a little below the ribs. The examination disclosed she had aspirated her stomach contents into her lungs. No fractures of any bones were found. An examination of the liver microscopically showed around the edges of the laceration a considerable amount of inflammation, indicating that the laceration of the liver was several hours old from the time the laceration occurred until she died, maybe 2 or 3, or maybe 10 or 12 hours. An analysis of the body's blood for its alcoholic content showed she had enough alcohol to be intoxicated. Dr. Forrest's opinion was that the laceration of the liver and the laceration of the intestine were the real causes of Sarah Moultrie Lindsay's death, with the other factors being contributory. On cross-examination Dr. Forrest testified: "I stated in my autopsy report that it was apparent this woman had received numerous blunt force injuries, the most serious of which was the laceration of the liver with hemorrhage into tñe peritoneal cavity and that the blood on the thighs and the perineum apparently came from the colon." He also testified on redirect examination: "I think it would be very unlikely for a person to have her liver lacerated upon rolling off an ordinary cot or bed. I have plus that my experience of nine years in pathology; having seen many lacerations of the liver, I have never seen one result from a person falling out of bed."

The State introduced in evidence, without any objection, a statement made by the defendant Horner on the afternoon of 1 October 1957 in the office of the Sheriff of Cumberland County in the presence of three deputy sheriffs, the substance of which follows: Shortly after dark on 27 September 1957 he was at the Crystal Drive-In on 301 South Street, Fayetteville, when a car drove up. Clyde Taylor was driving the car, and in it were the defendant Gordy and Sarah Moultrie Lindsay, who "was over in the car on the seat or on the floor." Gordy

STATE *v.* HORNER.

told him they had a woman in the back seat of the car, he could not tell him who she was. He (Horner) went and looked at the woman, and told them they had better get her somewhere, and get her to bed. About 11:00 or 12:00 o'clock that night they carried her to his (Horner's) house, and put her to bed. Clyde Taylor went back to town. He and the defendant Gordy stayed with the woman in his apartment until 5:00 o'clock a. m. He was very high. He and Gordy were in a double bed in his apartment, and the woman was in a cot in his apartment. At 5:00 o'clock a. m. on 28 September 1957 they carried the woman to the home of Eunice Hall. (Other evidence in the record shows that the home of Eunice Hall is about a mile, or a little less, from the place in the road where Mrs. Faircloth and the two deputy sheriffs saw Sarah Moultrie Lindsay lying between 2:00 and 3:00 o'clock that afternoon). All three went in the Hall home. He identified himself to Eunice Hall, who was cooking breakfast. Gordy and the woman took some drinks of whiskey out of a bottle they had left, and he took one drink. While the Hall woman was still cooking, the woman went over, laid down on a cot, and soon rolled off the cot onto the floor. She moaned and groaned. He then noticed she had on no breeches, and that she had started bleeding, blood trickling down her legs. He and Eunice cleaned her up, and placed her on the cot. He and Gordy took her out of the house, placed her in the car and carried her down "the side road where she was later found." When they got there, "they started to put her out of the car . . . , she started raising cain and said he couldn't leave her." He gave her a shove, ran and got in his car, and they drove off. It was 8:15 to 8:30 in the morning. He and Gordy went to the White House on Robeson Street, where they got beer. They stayed there some 30 or 40 minutes, and went back to the home of Eunice Hall.

The defendant Horner had a 1951 Plymouth automobile. On the Monday following the date of the death of Sarah Moultrie Lindsay, Deputy Sheriff Baxley examined this car. It had a new seat cover on the front seat. Next day, Tuesday, Baxley went to where Horner worked, and told him they wanted to talk with him at the office. Horner got in his car, and as they drove in the driveway at the courthouse, Baxley said: "I imagine you know why we picked you up?" Horner replied, "Yes, I have been expecting it; I saw you out at the car yesterday." Horner said he had the seat cover changed Saturday. The Lindsay woman died that Saturday. In the Sheriff's office Baxley told Horner that they knew he and Gordy had been with Sarah Moultrie Lindsay on Friday night and Saturday morning, the date of her death. Horner replied: "Yes, told me that he and his brother Billy Horner, a Taylor boy and Billy Gordy carried her to his house about 11:00 o'clock, put her to bed there; that they all came back to town, other than Taylor. They messed around the drive-in a while on Gillespie

Street, Crystal Drive-In, and that he and Billy Gordy went back to the house and they stayed there until 3:00 or 3:30 in the morning, and that they then taken her and went to the home of Eunice Hall. And he says, 'That is where it happened.' I imagine it is two miles from the house of Horner to the house of Eunice Hall."

On the same afternoon that the defendant Horner made a statement, the defendant Gordy made a statement to Deputy Sheriff, Mrs. L. L. Guy, which was admitted without objection, and the substance of which is as follows: On Friday night 27 September 1957, about 8:00 p. m., he and Clyde Taylor were at the Crystal Drive-In. They had been drinking vodka, and bought whiskey. There they got up with Dink Horner and the defendant Horner in another car. They then went to the Flamingo Bar on Gillespie Street, where they had several beers. He and Dink Horner left in his car, drove around town, and went back to the Crystal Drive-In. The defendant Horner came back to the Crystal Drive-In. He bought more whiskey. Clyde Taylor came back to the Crystal Drive-In "pretty well drunk." He said he spent the night riding around either with the defendant Horner or Clyde Taylor, and then added he and the defendant Horner spent the night at the home of Eunice Hall.

On the following day the defendant Gordy made another statement to Mrs. L. L. Guy, which was admitted without objection. The substance of it follows: After telling about considerable drinking on this Friday night by Clyde Taylor, the defendant Horner, himself, and others at various places, using 3 cars, he said Clyde Taylor got him at the Crystal Drive-In, and said: "Let's go." Here it became confusing to him. They got into Clyde Taylor's car, and Taylor drove off. He does not know whether they left the Crystal Drive-In, or how far they went. Anyway, they stopped, and put the woman in the car. They rode around, and he must have passed out, because they reached Eunice Hall's house about 3:00 o'clock a. m. He remembers their shaking him. He took a couple of drinks, went out of the house, and got in the back of the defendant Horner's car. The woman was in the car. This was about 8:00 o'clock a. m. They left Eunice Hall's house, and the next thing he remembered the defendant Horner was telling him to lets go and get the beer. This was at the White House. The defendant Gordy was shown the pocketbook found at the place Sarah Moultrie Lindsay was lying in the road, and identified it as belonging to her. On cross-examination Mrs. Guy testified that Gordy said when he made his first statement to her, he had been drinking the night before and things were very hazy in his mind as to what had occurred, and he was not absolutely sure of what he was saying. When he made his second statement, he said he had been drinking.

On 27 and 28 September 1957 James Huggins was living almost

straight across the road from the home of Eunice Hall. The distance between their houses is about 350 feet. On Saturday morning, 28 September 1957, he got up to go to work at 6:30 o'clock. Not too long before this time he heard a noise, got up, and went out on his front porch. It was dark. He heard a woman holloing, and it came from straight across the road, and that house is Eunice Hall's. This woman was holloing, "Help, somebody help me." He heard the woman's voice calling three times. There was a light on in the back of Eunice Hall's house, and it looked like an automobile was sitting in the yard. He stayed on his front porch not over a couple of minutes. On cross-examination he testified there are three houses close to Eunice Hall's house, and he couldn't be sure from which house the noise was coming.

On Saturday morning C. C. Chapman, who lives about 35 yards from Eunice Hall's house, got up about 8:00 o'clock to prepare breakfast. At this time he saw two men drag a woman out of Eunice Hall's house. She looked to him like she was drunk. The two men were holding her up under the arms, and he saw the two men drag her from the door to the edge of the porch. He did not then see Eunice Hall. The men and the woman were white. The men's backs were to him, and he did not recognize either of the men. His coffee was percolating, he turned from the kitchen window, and did not see them any more. He moved into the house where he was living on the third of March. He saw Eunice Hall later that morning. On cross-examination C. C. Chapman said he saw two men take hold of the woman's arms, and drag her to a parked car. On redirect examination he testified, "on the morning of the 28th of September, 1957, before 6:30 a.m., there was no one screaming or holloing at my house at all." On recross-examination he said he got up about 8:00 o'clock a.m.; he slept soundly all night, and did not know what was happening before that time.

William Allen and his wife live in a house about 50 or 60 feet from the house of Eunice Hall. They were at home on 27 and 28 September 1957. On Saturday morning, 28 September 1957, they got up between 7:30 a. m. and 8:30 a. m. That morning Mrs. Allen saw the defendant Horner's car in Eunice Hall's yard. She does not know when his car left that morning. She saw his car there in the yard later when the ambulance went after Sarah Moultrie Lindsay about 2:00 o'clock p. m. When the ambulance passed, Eunice Hall went to the Allen home. William Allen said before he got up this Saturday morning he heard cars going in and out and doors slamming. No one did any screaming or holloing for help in the Allen house that night or morning.

The State did not call Eunice Hall as a witness.

A person is legally accountable if the direct cause of a person's death is the natural result of his criminal act. *S. v. Knight,* 247 N.C. 754, 102 S.E. 2d 259; *S. v. Minton,* 234 N.C. 716, 68 S.E. 2d 844.

It is thoroughly established law in this State that, without regard to any previous confederation or design, when two or more persons aid and abet each other in the commission of a crime, all are principals and equally guilty. *S. v. Kelly, supra; S. v. Spencer,* 239 N.C. 604, 80 S.E. 2d 670; *S. v. Gosnell,* 208 N.C. 401, 181 S.E. 323; *S. v. Donnell,* 202 N.C. 782, 164 S.E. 352; *S. v. Beal,* 199 N.C. 278, 154 S.E. 604; *S. v. Hart,* 186 N.C. 582, 120 S.E. 345; *S. v. Jarrell,* 141 N.C. 722, 53 S.E. 127.

Mere presence, even with the intention of assisting, cannot be said to be aiding and abetting, unless the intention to assist, if necessary, was in some way communicated to the actual perpetrator of the crime. *S. v. Kelly, supra; S. v. Ham,* 238 N.C. 94, 76 S.E. 2d 346; *S. v. Holland,* 234 N.C. 354, 67 S.E. 2d 272; *S. v. Johnson,* 220 N.C. 773, 18 S.E. 2d 358.

The State's evidence is circumstantial. This Court in *S. v. Cash,* 219 N.C. 818, 15 S.E. 2d 277, quoted Merrimon, C. J., in *S. v. Brackville,* 106 N.C. 701, 11 S.E. 284, as follows: "Circumstantial evidence is not only a recognized and accepted instrumentality in the ascertainment of truth, but it is essential, and, when properly understood and applied, highly satisfactory in matters of the gravest moment."

The rule in respect to the sufficiency of circumstantial evidence to carry the case to the jury is stated in *S. v. Stephens,* 244 N.C. 380, 93 S.E. 2d 431, as follows: "We are advertent to the intimation in some of the decisions involving circumstantial evidence that to withstand a motion for nonsuit the circumstances must be inconsistent with innocence and must exclude every reasonable hypothesis except that of guilt. We think the correct rule is given in *S. v. Simmons,* 240 N.C. 780, 83 S.E. 2d 904, quoting from *S. v. Johnson,* 199 N.C. 429, 154 S.E. 730; 'If there be any evidence tending to prove the fact in issue or which reasonably conduces to its conclusion as a fairly logical and legitimate deduction, and not merely such as raises a suspicion or conjecture in regard to it, the case should be submitted to the jury.' "

The statements made by the defendants were not made in the presence of each other, and, therefore, what each one said is to be considered against the one making the statements, and not against the other. Horner said Gordy and himself were with Sarah Moultrie Lindsay in his apartment from 11:00 or 12:00 o'clock at night until about 5:00 a. m. on 28 September 1957, when they carried her to the home of Eunice Hall. Gordy said they reached Eunice Hall's house with the woman about 3:00 o'clock that morning. Both said they drove away from Eunice Hall's house in a car with the woman in it about 8:00 o'clock that morning. C. C. Chapman testified that he lived about 35 yards from Eunice Hall's house, and that about 8:00 o'clock this morning he saw two men drag a woman out of Eunice Hall's house to

a parked car. James Huggins testified that he lived straight across the road from the house of Eunice Hall, about 350 feet away, and that not too long before 6:30 this morning he was out on his front porch, and heard a woman holloing from straight across the road, "Help, somebody help me." He heard the woman's voice calling three times. On Tuesday following the woman's death Horner told Deputy Sheriff Baxley that Gordy and he carried the Lindsay woman to Eunice Hall's house about 3:00 or 3:30 a. m. after their staying in his apartment with her some 4 hours, and "that is where it happened." Horner said he and Gordy took the Lindsay woman out of the house, placed her in the car and carried her down "the side road where she was later found." Horner also said, when they got there "they started to put her out of the car . . . , she started raising cain and said he couldn't leave her." He further said he gave her a shove, ran and got in the car, and they drove off. The officers found a woman's purse lying about 10 feet from the Lindsay woman, when they found her in the road. Gordy identified this purse as belonging to her. Horner said that after putting the woman out in the road, they went to the White House, got beer, stayed there some 30 or 40 minutes, and went back to the Eunice Hall house. Mrs. William Allen, who lived about 50 or 60 feet from Eunice Hall, testified she saw Horner's car in Eunice Hall's yard, when the ambulance went after the Lindsay woman about 2:00 p. m.

Between 2:00 and 3:00 o'clock on the afternoon of this day the Lindsay woman was found lying in the road in a dying condition. She was dead at or before 4:00 o'clock on the same afternoon. An examination and autopsy of her body the next day showed numerous bruises on her body, including 9 small bruises on the abdomen, and a tear in her liver and a tear in the large intestine next to the liver. Dr. Forrest, a medical expert in the field of pathology, who conducted an examination and autopsy of the body, gave it as his opinion that the real cause of her death was the laceration of the liver and the laceration of the intestine. He also said he thought it was very unlikely for a person to have her liver lacerated upon rolling off an ordinary cot or bed. The body had no bone fractures. Dr. Forrest also testified that a microscopic examination of the edges of the laceration of the liver indicated that it was several hours old from the time the laceration occurred until she died.

In our opinion, the evidence, considered in the light most favorable to the State, permits, but does not compel, the reasonable and legitimate inferences that from at least about 5:00 a.m to about 8:00 a. m. on Saturday, 28 September 1957, Eunice Hall, the two defendants and Sarah Moultrie Lindsay were the only ones in the house of Eunice Hall, that the Lindsay woman was drunk, that thede while both de-

fendants were present, one or both gave her a terrible beating, causing her to cry out "Help, somebody help me," and that if only one defendant beat her, the other defendant was present aiding and abetting in the beating, that among the blows struck were blows to her abdomen causing lacerations of her liver and intestine next to the liver, and that these lacerations were the direct cause of her death about 4:00 p.m. that afternoon.

Manslaughter is generally divided into voluntary and involuntary manslaughter. *S. v. Durham,* 201 N.C. 724, 161 S.E. 398; 40 C.J.S., Homicide, Sec. 37. This Court said in *S. v. Hovis,* 233 N.C. 359, 64 S.E. 2d 564: "Involuntary manslaughter has been defined to be, 'Where death results unintentionally, so far as the defendant is concerned, from an unlawful act on his part not amounting to a felony, or from a lawful act negligently done.'" The unlawful killing of a human being without malice is manslaughter. *S. v. Street,* 241 N.C. 689, 86 S.E. 2d 277. The indictment charges manslaughter. G.S. 15-144. We conclude that the State, considering its evidence in the light most favorable to it, offered sufficient evidence of all the essential elements of manslaughter against both defendants to withstand each defendant's motion for judgment of nonsuit.

There are no assignments of error as to the admission or exclusion of evidence. The other assignments of error are formal, and are overruled.

No Error.

HIGGINS, J., dissenting: This is one of the few, occasions in which I find it impossible to agree with my brethren. The evidence in the case discloses that on Friday night, September 27, 1957, just after dark, the defendant Horner was at a drive-in theater in Fayetteville. At that time one Clyde Taylor drove up. In the car with him were the defendant Gordy and a woman who was lying in the seat or on the floor of the car. Gordy said he could not tell Horner who she was. The defendant Horner looked at her and said they had better get her somewhere and get her to bed. Thereafter, they took her to Horner's house and put her to bed. Taylor left. About five next morning the defendants took her to Eunice Hall's house. Eunice was up, getting breakfast. The three did more drinking. What took place thereafter is stated fully in the Court's opinion.

It seems to be the theory of the State that somewhere, probably at Eunice Hall's house, the defendants administered to Sarah Lindsay a terrible beating which finally caused her death; that the call, "Help, someone help me," heard in the vicinity, not only came from the Hall house but it came from the deceased because of a beating she was

then receiving; and, further, that the beating was being administered by the defendants. The State successfully asked the jury to find the above without calling the one person apparently in a position to know firsthand what happened—Eunice Hall. The State says its theory is supported by Horner's statement: "There (the Hall house) is where it happened." Where what happened? Horner didn't say. The officer didn't ask him. According to the State's evidence one thing certainly did happen at the Hall house—an obese woman with an enlarged liver fell off a cot and after the fall, "she groaned and groaned."

One of the State's witnesses testified that about eight o'clock on Saturday morning two men dragged a woman from the Hall house towards a car. However, further questioning elicited the following: "What I saw the men doing was helping the woman off the porch." Thereafter, the defendants—Horner driving—took the woman to the place where she was found about six hours later and put her out of the car. After they put her out, "she started to raise cain and said they couldn't leave her, and she tried to get back in the car." Horner shoved her back, got in the car and drove off. Such is the State's evidence, gained in part by interrogation of the defendants, but none the less the State's evidence. That a woman should "raise cain" and should try to get back in the car with two men who had terribly beaten her presents a picture that is a little too much out of focus for my mental gallery.

The first time Horner saw the woman she was either lying on the back seat or on the floor of Taylor's car, "passed out." Taylor and Gordy were also in the car. What injuries she had received, if any, or how she had received them prior to the time Horner first saw her does not appear. Gordy could not tell Horner who she was; and Taylor, the owner of the car, was not called to testify. There is not a particle of evidence that either defendant laid a violent hand on Sarah Lindsay, except Horner. The evidence indicates all he did was to shove her away when she tried to get back in the car.

The most suspicious thing in the case, however, was Horner's removal of the seat covers of his car to get rid of the bloodstains. This occurred after it became known that Sarah Lindsay had died. When asked about it, he told the officers and showed them the old seat covers. It is understandable, that after such a night, he would want to remove the bloodstains. But, after all, the important and the unanswered question is how the injury occurred that caused the blood. Where, when, how the fatal injuries were received, the evidence does not disclose. The answers are in the realm of speculation and guess. Had she been injured when Taylor and Gordy appeared with her at the drive-in? Was she injured by the fall from the cot? What happened to her during

the six hours between the time the defendants left her and the time she was discovered still alive, are unanswered questions. "True it is, the evidence seems to point an accusing finger at the defendant as the perpetrator of the crime, and to excite suspicion, somewhat strongly perhaps, of his guilt, but it apparently leaves too much to surmise or assumption to support a conviction." The foregoing are the words of the late Chief Justice Stacy in the case of *State v. Harvey*, 228 N.C. 62, 44 S.E. 2d 472. They fit this case.

I can agree the defendants' conduct in putting this woman out in the rain was shabby indeed, but to say the evidence supports manslaughter is too much for me. I vote to reverse.