STATE v. JAMES MONROE FOUST.

(Filed 11 January 1963.)

**1. Criminal Law § 38; Homicide § 14—**

Where defendant contends that his gun accidentally fired during playful scuffling between him and deceased, testimony of a nonexpert of firearms as to experiments he made with the gun and that the gun could not be fired unless the hammer was pulled completely back and the trigger pulled, *is held* incompetent in the absence of evidence that his experiments were carried out under substantially similar circumstances as those which surrounded the firing of the gun when deceased was killed.

**2. Homicide § 5—**

Murder in the second degree is the unlawful killing of a human being with malice but without premeditation and deliberation.

**3. Same—**

Malice as an essential element of murder in the second degree may be either express or implied, and need not amount to hatred, ill-will, or spite, but is sufficient if there is an intentional taking of the life of another without just cause, excuse, or justification.

**4. Homicide § 20— Evidence of malice held insufficient to be submitted to the jury.**

Where the sole and uncontradicted evidence relating to the actual killing is defendant's testimony that his gun accidentally fired and that he killed deceased through misadventure, testimony of declarations theretofore made by the sixteen-year-old defendant to the effect that if deceased went with anyone else he would kill her, which declarations were made under circumstances disclosing the absence of anger or heated passion and amounted only to "a sort of sweetheart" talk on social dates, *is held* insufficient to be submitted to the jury on the essential element of malice, even though there is evidence that shortly before the killing deceased had dated another boy, and defendant's motion to nonsuit the charge of murder in the second degree should have been allowed.

**5. Homicide § 6—**

Manslaughter is the unlawful killing of a human being without intention to kill or inflict serious bodily injury, and without malice, either express or implied, and with few exceptions every unintentional killing of

a human being proximately caused by a wanton or reckless use of firearms amounts to involuntary manslaughter, at least.

**6. Homicide § 20—**

Evidence tending to show that defendant and deceased were playfully scuffling with defendant's loaded gun when the gun accidentally fired, inflicting mortal injury, *held* sufficient to be submitted to the jury on the question of defendant's guilt of involuntary manslaughter.

**7. Homicide § 6;   Negligence § 32—**

Contributory negligence, as such, is no defense to a charge of manslaughter, but defendant is entitled to show, if he can, that deceased met her death wholly as a result of her own negligence or misconduct.

**8. Homicide § 19—**

Defendant having admitted that deceased died as a result of a wound from his gun, the admission of ten color photographs of the body of deceased would seem excessive.

APPEAL by defendant from *Bickett, J.,* March 1962 Regular Criminal Term of ALAMANCE.

Criminal prosecution tried upon an indictment charging the defendant with the murder of Sylvia Elaine Bull. G.S. 15-144.

When the case was called for trial, the solicitor announced that the State would not insist upon a verdict of guilty of murder in the first degree, but would ask for a verdict of guilty of murder in the second degree or of manslaughter as the evidence might disclose.

Plea: Not Guilty. Verdict: Guilty of murder in the second degree.

From a judgment of imprisonment, defendant appeals.

*Attorney General T. W. Bruton and Assistant Attorney General James F. Bullock for the State.*

*Clarence Ross and B. F. Wood for defendant appellant.*

PARKER, J.   The State's evidence presents these facts:

On the morning of 5 January 1962 defendant, James Monroe Foust, a boy about sixteen years of age, had been hunting in the woods near the Bull home with a 22-410 combination rifle and shotgun, with the rifle barrel on top and the shotgun barrel on the bottom. Sylvia Elaine Bull, a sixteen-year-old girl with whom he had been going, gave him this rifle and gun combination as a 1961 Christmas present. About noon he went to the Bull home. He knocked, was admitted by Tomaka Bull, and went into the "den-kitchen" where Sylvia was asleep on a little bed or cot. She had on a white blouse and blue slacks, but no stockings or shoes. He waked her up, and took a seat on the bed beside

her. Sylvia, Tomaka, and defendant were the only persons in the house. A radio by the bed was playing loud.

Tomaka was in the kitchen washing dishes, and could not see Sylvia and defendant from where she was. She heard them talking, but did not know what they said. She heard no fuss between them. About half an hour after defendant's arrival, while she was trying to get milk out of the ice box, she heard a gun fire. She turned around, saw blood and a gun lying across the bed beside Sylvia, but did not see the defendant. She ran out of the house to a neighbor's house across the street.

In response to a call Lewis Strickland, Jr., coroner of Alamance County, arrived at the Bull home about 1:20 p.m. Upon arrival he saw defendant in the front yard, who told him "a girl had been shot* * * he did it, but that it was an accident," and he carried him to where the girl was. The coroner found Sylvia Elaine Bull in the "den-kitchen" lying dead on a little bed. She was stretched out full length, with her hands folded across her chest, cover partially on her, and with a quantity of blood around her chin. She had a wound about one-fourth of an inch wide and about three-eights of an inch long in her chin about halfway between her right ear and the right corner of her mouth. Around the wound was a powder burn area about two inches square. There was a cigarette between her index and middle fingers which had burned into the flesh. He found the gun in the living room next to the room where Sylvia's body was. There was an empty shell in the shotgun barrel. The rifle barrel had an unfired cartridge in it. The defendant said "he had moved the gun himself from the floor beside the cot to the position in which I found it."

The coroner testified that the defendant told him this is what occurred when he entered the Bull home: "He went to where Sylvia was asleep on the little bed. That he woke her up and they started cutting up playfully, and she grabbed the gun and he said that he had the gun across his knees, and that after they began to cut up, you know, play, that she grabbed the gun and she jerked it back, and if I recall correctly, the first time this happened nothing happened, and they continued playing and she grabbed the gun again and he jerked it back and he said it went off, and he went to call the officers. * * *He later stated at the police department in Gibsonville that he thought the gun was unloaded when he went into the house. He said he did not know how the gun fired."

M. W. Millikan, chief of police of Gibsonville, testified on direct examination as follows: "I asked [defendant] what happened and he stated he had been out hunting that morning and come into the house and sat down on the side of the bed by Sylvia and got to playing or picking at one another, as he put it, and she grabbed for the gun on

two different occasions and the second time it went off. I asked him if he had shot the gun previously that day and he said, as I recall, that he had shot the gun once or twice. * * * Defendant stated that the girl was shot with the 410 gauge barrel, and that he had shot this barrel at least twice that morning. * * * He said he thought he unloaded it." Defendant also told Millikan the following: "He was sitting on the bed with her head to his left and that he was sitting about half ways of the bed with the gun laying on his knees, about like this (indicating). He said he was sitting right close to her and that she took hold of the gun—the first time she grabbed it under the breach part here, and he said he got it away from her, and she got it again near the end of the barrel, and that is when the gun went off."

The defendant told Millikan "he had been dating Sylvia for a few months, and that she had started going with another boy by the name of Junior Atkinson." Millikan asked him if he was mad about this, and he replied "he wasn't mad, but he did not like it." On cross-examination Millikan testified, "he told me that he did not move the girl in any manner, but that he opened her eye."

Marie Bull Wyrick, a sister of Sylvia, in response to a call went home, and found there the coroner, Millikan, the defendant, and some neighbors. She testified: "I asked James what happened and he said he come in from hunting and he sat down on the bed beside Sylvia and said Sylvia tickled him and he moved his (sic) like that and hit the gun and it went off, and I said, 'What, was the gun loaded?' I said, 'What did you go in the house with a loaded gun for,' and he said that he unloaded the gun before he went in."

Mrs. Roy Bull, mother of Sylvia, testified in substance: She has known defendant since he was a little boy: his family lived in their community. Sylvia would spend several days at the time at the home of defendant's mother, would come home, and go back again. Defendant and Sylvia had been dating for about six months. Sylvia dated the Atkinson boy after Christmas. Defendant occasionally stayed with his relatives across the street from their home.

Allen Barbee testified for the State in substance: He lives near the Bull home. Defendant and Sylvia visited his home often. Sylvia had given defendant a gun for Christmas. She wanted to buy it back, and defendant said "he would see her dead before she would get it back." They argued with each other sometime as kids will. They argued about her going with another boy. He said, "that if he couldn't have her nobody else would."

Matthew Atkinson, Jr., a witness for the State, testified he and Bobby Jean had double dated with Sylvia and defendant in his car. On one occasion Sylvia and defendant were sitting in the back seat of

his car in front of Bobby Jean's home. He testified on cross-examination: "They [defendant and Sylvia] were not arguing, just talking, and out of the bue sky he said, 'if you go with anybody else, I will kill you.' I did not know she was going with anyone else at the time. It was just sort of sweetheart talk."

Defendant assigns as errors that Chief Millikan was permitted by the court, over his objections and exceptions, to testify as to experiments he made with the gun whose firing killed Sylvia. He testified in substance: The gun had been in his possession continuously since the death of Sylvia. The gun could not be fired by pulling the hammer part way back and turning it loose without pulling the trigger. The hammer had to be pulled back "in gauge position" before he could fire it. The "safety gauge" makes it necessary that the hammer be pulled back all the way. For the gun to fire it had to be cocked and the trigger pulled. He used shells of the same make as the empty shell he found in the 410 shotgun barrel. He has had no instruction or schooling to qualify as an expert in the mechanism of a gun of this type. He does not know the pressure needed to cause the shell to explode.

There is no other evidence in the record as to how the safety device on this gun operates. There is no evidence in the record as to whether the safety device on the gun was on or off when it fired and killed Sylvia, or as to whether at that time it was cocked or not. There is no evidence in the record that when Millikan made his experiments the gun was in substantially the same condition as on the day Sylvia was killed. Defendant's defense is that the shooting of the gun resulting in Sylvia's death was by accident or misadventure. In our opinion the experimental evidence given by Millikan should have been rejected, because it does not appear from the evidence before us that his experiments were carried out under substantially similar circumstances to those which surrounded the firing of the gun when Sylvia was killed. *S. v. Phillips,* 228 N.C. 595, 46 S.E. 2d 720.

Defendant offered no evidence.

Defendant assigns as error the denial by the court of his motion for judgment of involuntary nonsuit as to the charge against him of murder in the second degree. The court in its charge stated that the jury could return one of three verdicts: Guilty of murder in the second degree, Guilty of involuntary manslaughter, or Not Guilty. The court in its charge instructed the jury in substance that if they found from the evidence, and beyond a reasonable doubt, that on 5 January 1962 defendant feloniously and intentionally shot and killed Sylvia Elaine Bull, and that he did so with malice, as that term had been defined to them, it would be their duty to return a verdict of guilty of murder in the second degree. The jury convicted the defendant of murder in the second degree.

Murder in the second degree is the unlawful killing of a human being with malice, but without premeditation and deliberation. *S. v. Downey,* 253 N.C. 348, 117 S.E. 2d 39; *S. v. Crisp,* 244 N.C. 407, 94 S.E. 2d 402; *S. v. Benson,* 183 N.C. 795, 111 S.E. 869.

Malice as an essential characteristic of the crime of murder in the second degree may be either express or implied. 40 C.J.S., Homicide, sec. 16, p. 862; 26 Am. Jur., Homicide, sec. 41, p. 185. This Court said in *S. v. Benson, supra:*

> "Malice is not only hatred, ill-will, or spite, as it is ordinarily understood—to be sure that is malice—but it also means that condition of mind which prompts a person to take the life of another intentionally without just cause, excuse, or justification. *S. v. Banks,* 143 N.C. 652. It may be shown by evidence of hatred, ill-will, or dislike, and it is implied in law from the killing with a deadly weapon; and a pistol or a gun is a deadly weapon. *S. v. Lane,* 166 N.C. 333."

The statements of defendant to the effect that if Sylvia went with anyone else, he would kill her, that if he couldn't have her, nobody else would, and his arguing with her about going with another boy, considered under the circumstances and in the setting when uttered, and in the light of all of the State's evidence, are, in our opinion, as a witness said, a "just sort of sweetheart talk" by this sixteen-year-old boy, and do not permit a legitimate inference that defendant killed Sylvia with express malice, or intentionally, or with implied malice. The facts in respect to the firing of the gun resulting in Sylvia's death rest upon statements coming from the defendant, in none of which is it said that the killing was intentional, and in none of which is anything said that shows or would permit the reasonable inference that the killing was done with malice, express or implied. Considering the evidence in the light most favorable to the State, there is nothing in the evidence to show that Sylvia was killed with malice, either express or implied, and to support a verdict of guilty of murder in the second degree. The court committed prejudicial error in submitting the question of second degree murder to the jury.

Defendant's assignment of error that the court erred in overruling his motion for judgment of compulsory nonsuit as to the charge against him of involuntary manslaughter is untenable.

This Court said in *S. v. Hovis,* 233 N.C. 359, 64 S.E. 2d 564:

> "* * *Where one engages in an unlawful and dangerous act, such as 'fooling with an old gun,' *i.e.,* using a loaded pistol in a careless and reckless manner, or pointing it at another, and kills

the other by accident, he would be guilty of an unlawful homicide or manslaughter. G.S. 14-34; *S. v. Vines,* 93 N.C. 493; *S. v. Trollinger,* 162 N.C. 618, 77 S.E. 957; *S. v. Limerick,* 146 N.C. 649, 61 S.E. 568.

"Involuntary manslaughter has been defined to be, 'Where death results unintentionally, so far as the defendant is concerned, from an unlawful act on his part not amounting to a felony, or from a lawful act negligently done.' [Citing authority.]"

To constitute involuntary manslaughter, the homicide must have been without intention to kill or inflict serious bodily injury, and without either express or implied malice. *S. v. Honeycutt,* 250 N.C. 229, 108 S.E. 2d 485; *S. v. Satterfield,* 198 N.C. 682, 153 S.E. 155; 40 C.J.S., Homicide, sec. 56.

It seems that, with few exceptions, it may be said that every unintentional killing of a human being proximately caused by a wanton or reckless use of firearms, in the absence of intent to discharge the weapon, or in the belief that it is not loaded, and under circumstances not evidencing a heart devoid of a sense of social duty, is involuntary manslaughter. *S. v. Vines,* 93 N.C. 493, 53 Am. Rep. 466; *S. v. Turnage,* 138 N.C. 566, 49 S.E. 913; *S. v. Stitt,* 146 N.C. 643, 61 S.E. 566; *S. v. Bryant,* 180 N.C. 690, 104 S.E. 369; *S. v. Hovis, supra;* 26 Am. Jur., Homicide, sec. 212; 40 C.J.S., Homicide, sec. 59.

Considering the State's evidence in the light most favorable to it, it shows that defendant, carrying a 22-410 combination rifle and shotgun with both barrels loaded, went to the little bed or cot where Sylvia was asleep, waked her up, had the gun with him by the little bed, that he and Sylvia began pranking with this gun and the shotgun barrel fired killing Sylvia. In our opinion, the State's evidence was sufficient to carry the case to the jury on the question of involuntary manslaughter. Defendant's statements, particularly that it was an accident, do not exculpate him.

Contributory negligence as such has no place in the law of crimes. *S. v. Cope,* 204 N.C. 28, 167 S.E. 456; *S. v. Ward,* 258, N.C. 330, 128 S.E. 2d 673. But the defendant is entitled to show, if he can, that Sylvia met her death wholly as a result of her own conduct, and not because of any wanton or reckless use of firearms on his part. *S. v. Eldridge,* 197 N.C. 626, 150 S.E. 125; *S. v. Phelps,* 242 N.C. 540, 89 S.E. 2d 132.

Of course, nothing said herein militates in any way against the doctrine upheld in *S v. Horton,* 139 N.C. 588, 51 S.E. 945; *S. v. Satterfield, supra; S. v. Honeycutt, supra,* and other cases, of a misadventurous homicide.

The State offered in evidence ten gory photographs in color of the dead body of Sylvia, and had the coroner to explain his testimony as to the death wound in her chin in respect to each photograph in detail. Defendant excepted to the use of the ten photographs, stating that he would stipulate that Sylvia died as a result of the gunshot wound which came from the weapon in the State's possession. We have held the fact that an authenticated photograph is gory, or gruesome, and may tend to arouse prejudice will not not alone render it incompent to be so used *S. v. Rogers,* 233 N.C. 390, 64 S.E. 2d 572; *S. v. Gardner,* 228 N.C. 567, 46 S.E. 2d 824. However, under the circumstances here it seems there was an excessive use of these ten photographs by the State.

For the prejudicial errors pointed out above, defendant is entitled to a new trial on the issue of whether he is guilty of involuntary manslaughter or not guilty, and it is so ordered.

New trial.