STATE OF NORTH CAROLINA v. RALPH L. STIMPSON

No. 97

(Filed 15 December 1971)

**1. Homicide § 31— maximum penalty for involuntary manslaughter**

The maximum term of imprisonment for involuntary manslaughter is ten years.

**2. Homicide § 6— pointing loaded gun at another — accidental discharge — manslaughter**

At common law and under G.S. 14-18, one who points a loaded gun at another, though without intention of discharging it, is guilty of manslaughter if the gun goes off accidentally and kills.

**3. Homicide § 30— failure to submit involuntary manslaughter**

In this prosecution for second degree murder or manslaughter, the trial court erred in failing to instruct the jury with reference to involuntary manslaughter and to submit to the jury whether defendant was guilty of involuntary manslaughter where defendant presented evidence tending to show that although he had drawn his pistol on the victim, he did not intend to discharge it, and that the pistol accidentally discharged when the victim attempted to grab the pistol and struck his hand.

State v. Stimpson

4. **Criminal Law § 86— impeachment of defendant — cross-examination as to indictment for another crime**

In this homicide prosecution in which defendant offered evidence and contended that the discharge of his pistol was accidental and not intentional, the trial court committed prejudicial error in allowing the solicitor to cross-examine defendant, for the purpose of impeachment, as to whether he had been indicted for murder in New York State in 1964.

APPEAL by defendant from *Johnston, J.,* March 29, 1971 Session of GUILFORD Superior Court, transferred from the Court of Appeals for initial appellate review by the Supreme Court under general order of July 31, 1970, entered pursuant to G.S. 7A-31(b)(4).

Defendant was indicted, in the form prescribed by G.S. 15-144, for the murder of Lillian Holland on September 19, 1970, and tried thereon for murder in the second degree or manslaughter.

Evidence was offered by the State and by defendant.

Uncontradicted evidence tends to show the facts narrated in the following four paragraphs.

Mrs. Lillian Holland (Miss Lillie) and her daughter, Mrs. Betty Carpenter (Betty), resided in the first floor apartment at 1541 Gorrell Street in Greensboro. Another occupant, one Otis Perry, paid "to sleep there and [get] his meals." A stairway at the back of the Holland-Carpenter apartment led to an upstairs apartment where defendant resided.

William D. Thomas (Thomas), who lived in the same neighborhood, visited the Holland-Carpenter residence "quite often." Mrs. Daisy Degraffenreidt (Miss Daisy) was a neighbor and good friend of "Miss Lillie" and "would oftentimes drop by and see her and visit with her."

A bullet discharged from the pistol in the hand of defendant proximately caused Miss Lillie's death. The bullet entered "at the base of the neck on the left side." Death occurred at 4:00 a.m. on September 19, 1970, as the result of injury inflicted at a late hour of September 18, 1970, or at an early hour of September 19, 1970.

When the pistol fired, six persons were in the Holland-Carpenter apartment, namely, Miss Lillie, Thomas, Miss Daisy,

defendant, Betty and Otis Perry. Betty and Perry were asleep. Betty was in her bedroom, lying across her bed, fully dressed. Perry was on "a little green couch; . . . balled up in a knot, sleeping-snoring." Betty was aroused by the pistol shot. Perry was awakened when Betty "bumped into his head."

Betty and defendant were the only witnesses who testified to events of Friday, September 18th, prior to the occasion when Miss Lillie was fatally injured.

According to Betty: Defendant was known to her only by the name of "Neighbor." Around noon on September 18th, defendant came to the back of the Holland-Carpenter apartment and, stating he was too drunk to drive, asked Betty to drive his car and get him a bottle of whiskey, giving her a five dollar bill. She did not know how to start the car so defendant got in the car with her. They started toward the A.B.C. Store on Market Street. Along the way, they stopped at Alberta Young's house. Alberta got in the car and rode with them to the liquor store where they picked up a bottle of whiskey. On their way back they stopped at the Paradise Cafe where they saw "Barbara." With Alberta and Barbara in the back seat, Betty drove "to our backyard," where she parked defendant's car. At that time, defendant "flung the keys away." She did not know where he threw the keys; "[he] just throwed them." They went into the Holland-Carpenter apartment where Betty washed some glasses and the four of them sat down and drank the whole pint of whiskey. Then defendant "went up his back steps" to his room. When Alberta and Barbara left, she locked her screen door and "laid back down." After sleeping three hours, she got up, "went back down to the Paradise," where she saw Alberta and they "got to drinking beer." Later, when she returned, her mother had come home from work and opened the door for her. Betty went and "laid down on the bed." She remained asleep until "[t]he crack of the gun woke her up." She was then fully dressed. She jumped from her bed and ran from her bedroom. Miss Daisy and Thomas were in the kitchen, standing beside a little cabinet, "crouched down like they were afraid." She did not see defendant. "The door was closing as [she] ran in the room." Through the door space between the kitchen and the living room, she saw her mother on the couch, "slumped over," blood on her neck. She "called the ambulance."

State v. Stimpson

On cross-examination, she denied that she had bought seven or eight pints of liquor for her mother from the liquor store; denied that she had had any conversation with defendant about going to a store for some groceries; and stated that, although liquor had been sold in the house where she and her mother lived, none had been sold "for a long time." She also testified on cross-examination, in conflict with the testimony of Thomas and of Miss Daisy, that there was a pint of liquor sitting on the floor of the living room beside the coffee table and it looked like "maybe two or three drinks had been drunk out of it . . . ." She also testified that it was about midnight when she heard the crack of the gun; that she called the police; that she estimated it was thirty-five minutes or more before either the ambulance or the police arrived.

According to defendant: On September 18th, he lived next door to Miss Lillie and Betty. Each addressed the other simply as "Neighbor." He went to Miss Lillie's from time to time and had bought whiskey from Miss Lillie. Thomas (State's witness) was at Miss Lillie's every time he (defendant) went there. On September 18th, about 11:00 a.m., defendant "went over there to get a drink of liquor." Betty, who came to the door, said: "We don't have any." He then told Betty he was going to the store. Betty said she would go with him. He asked her if she could drive. When she told him she could and showed him her license, he remarked that he did not feel "so good" and told Betty to drive. At a liquor store, Betty bought "seven pints for herself and one for [him]," saying the seven pints were for her mother. Betty picked up two other girls and then drove to the yard of the Holland-Carpenter apartment and parked.

The three girls and defendant went in the apartment; Betty got some glasses and gave them drinks; and they sat there drinking and talking. Each had a full whiskey glass. When defendant and one of the girls asked for another drink, Betty replied that "she didn't have anymore," and that she "wasn't going to sell that because that was her mother's." Thereupon he told her: "I'll tell you what, you said you were going to get some food. I'll give you the car key if you will go out and get me a pint of whiskey." She said she would do this and he gave her his car keys and $3.25. The keys to his apartment were with his car keys. He went upstairs and lay down but about forty-five minutes later he got up and went to the window and saw his car was still "sitting there." He went to the door of the Holland-

Carpenter apartment and knocked two or three times but nobody answered. He then went to his car and "cut off" the "little button under the dashboard that you cut off to keep anybody from stealing it." Shortly after he returned to his apartment, he saw Betty and her two girl friends come around the house to the back door. He heard Betty say: "[H]e's done something to the car." He went to the back door and said: "Come back here and bring my keys and my money." Betty said she would be right back but "kept on going." He told her: "Don't mess around with my money and keys." When he last saw them, Betty and her two girl friends were crossing the street.

After waiting in vain for about two hours for Betty, he asked a neighbor, Mrs. Davidson, to watch his door, and told her the girl next door had his keys and he did not want "nobody to come in." When Mrs. Davidson agreed to do this, he got "a fellow" to take him to the store where he got "some food to cook and another pint of whiskey." When he got back, "nobody still wasn't home" in the Holland-Carpenter apartment. He went upstairs, fixed something to eat and "kept watching out the window to see if anybody come back, and nobody never did come." When he lay down finally, about six o'clock, he "dropped off to sleep," lying across his bed. Up to that time he had seen "no lights or nothing like that on" in the Holland-Carpenter apartment. When he woke up, his clock said, "quarter to three." He had to go to work about five-thirty to six. He saw the lights were on in the Holland-Carpenter apartment and went over there to get his keys. He knocked on the door and addressed Miss Lillie as usual saying, "Hello, Neighbor."

Thomas, Miss Daisy and defendant are the only persons who testified as to what happened while defendant was in the front (living) room of the Holland-Carpenter apartment.

According to Thomas: Miss Lillie opened the front door for defendant. Defendant walked in and told Miss Lillie he wanted his keys. When she said she "didn't know anything about any keys," defendant said, "If you don't give me my keys, I'll shoot you," and then "he flashed the gun." When this occurred, Miss Lillie was sitting on the sofa and defendant was pointing the gun "about her head and neck,"—"not over a foot from her head, if that much." Defendant told him: "Don't move. If you do, I'll shoot you too." Thomas said nothing but ran with Miss

Daisy into the kitchen. "[A] minute or two" later, while he was in the kitchen, he "heard one shot" and turned and looked back. At that time, "the screen door went together" and he did not see defendant any more. When he went back into the living room, Miss Lillie "was still on the sofa," and he saw blood on her neck.

According to Miss Daisy: She, Miss Lillie and Thomas were in the living room playing whist when a man stepped in the door. Miss Lillie was sitting (on a sofa) with her back toward the door. The man asked Miss Lillie for "some keys" and she replied that she did not have the keys. Thereupon, the man said: "If you don't give me my keys, I'm going to shoot you." When this occurred, she (Miss Daisy) and Thomas went into the kitchen, "running, halfway," and then heard "the gun go off." She testified: "I have not seen [defendant] before this trial as I know of."

According to defendant: After Miss Lillie opened the door, she went back and sat on the settee "behind the door as you go in." Miss Daisy, whom he had not seen there before, was sitting near the kitchen door. Thomas was sitting near the wall. He "didn't see them playing any cards," but saw "a pint of liquor setting down by the settee." He told Miss Lillie that her daughter (Betty) had his keys; and, in response to Miss Lillie's inquiry as to what Betty was doing with them, he explained that he had given them to Betty to go to the store and that she did not come back. Miss Lillie told him that Betty was asleep and she wasn't going to wake her up. When he said he had to have his keys, Thomas asked Miss Lillie: "Do you want me to throw him out?" Defendant said, "You ain't going to throw me out until I get my keys," and Thomas "started over there to get [him]" and Miss Lillie "put her hand to her pocket." Defendant said to Miss Lillie: "Keep your hands off the gun. . . . All I want is my keys. Tell your daughter to come get them." She said nothing but "looked up like this with her hand on her gun." She had a "pearl handled gun, looked about new." Earlier an incident had occurred in which Miss Lillie "had the gun out." By now defendant had drawn his own pistol. Miss Daisy ran out of the room. When she started back in the door, defendant waved his hand and said, "don't come in here." Thomas was still standing "where he first got up" and was looking at him. With her free hand, Miss Lillie attempted to grab his pistol,

struck his hand and "the gun went off." He did not intend for this to happen. He and Miss Lillie had never had any trouble. She was "a good lady when she wasn't drinking." When his gun fired, Miss Lillie's gun fell on the seat beside her. He "just turned around and walked out the door" and "didn't see where she got shot."

Police Officer J. R. Howard testified that he went to 1541 Gorrell Street as directed by a radio call; that he arrived at approximately 1:20 a.m. on September 19th; that he entered the living room through the front door and found to his right a lady (Miss Lillie) "half slouched over on the couch"; that "she was bleeding rather extensively"; that he arrived some eight or ten minutes before the ambulance arrived to take Miss Lillie to the hospital; that he talked with Thomas and Miss Daisy; and that both Thomas and Miss Daisy then told him they were *in the living room* when the shooting occurred and saw it.

Other evidence consists primarily of statements subsequently made by the State's witnesses and by defendant to officers, tending to corroborate or contradict their testimony and bearing upon the credibility thereof.

The jury returned a verdict of guilty of manslaughter. Judgment, which imposed a prison sentence of fifteen years subject to specified credits, was pronounced. Defendant excepted and appealed, setting forth numerous assignments of error.

*Attorney General Morgan and Assistant Attorney General Vanore for the State.*

*Wallace C. Harrelson, Public Defender, and Dale Shepherd, Assistant Public Defender, for defendant appellant.*

BOBBITT, Chief Justice.

Defendant assigns as error (1) the court's failure to instruct the jury that they could return a verdict of guilty of involuntary manslaughter, and (2) the overruling of objections to the cross-examination of defendant, for purposes of impeachment, with reference to his having been indicted in a different case. Discussion will be confined to these assignments.

Manslaughter and involuntary manslaughter differ in degree of criminality. The differences involve the elements of each crime and the prescribed punishment for each.

Prior to the effective date (April 10, 1933) of Chapter 249, Public Laws of 1933, G.S. 14-18 provided that manslaughter, whether voluntary or involuntary, was punishable by imprisonment for not less than four months and not more than twenty years. The 1933 Act amended G.S. 14-18 by adding: "Provided, however, that in cases of involuntary manslaughter, the punishment shall be in the discretion of the court, and the defendant may be fined or imprisoned, or both." "[T]he proviso was intended and designed to mitigate the punishment in cases of involuntary manslaughter, and to commit such punishment to the sound discretion of the trial judge." *State v. Dunn,* 208 N.C. 333, 335, 180 S.E. 708, 709 (1935).

[1]　In *State v. Blackmon,* 260 N.C. 352, 132 S.E. 2d 880 (1963), it was held that a statute (G.S. 14-55) prescribing punishment "by fine or imprisonment in the State's prison, or both, in the discretion of the court," did not prescribe "specific punishment" within the meaning of that term as used in G.S. 14-2. On authority of *Blackmon,* it was held in *State v. Adams,* 266 N.C. 406, 146 S.E. 2d 505 (1966), that the maximum lawful term of imprisonment for involuntary manslaughter is ten years.

The court instructed the jury they could return a verdict of guilty of murder in the second degree, or a verdict of guilty of manslaughter, or a verdict of not guilty. Clearly the court was referring solely to voluntary manslaughter. The charge contains no reference to involuntary manslaughter. The sentence imposed by the judgment was permissible only upon conviction for voluntary manslaughter.

The court properly instructed the jury that, *if* the State satisfied the jury beyond a reasonable doubt that defendant by the use of his pistol, a deadly weapon, *intentionally* shot and thereby killed Miss Lillie, the law would raise two presumptions, (1) that the killing was unlawful, and (2) that it was done with malice. *State v. Barrow,* 276 N.C. 381, 390, 172 S.E. 2d 512, 518 (1970), and cases cited. The court did not instruct in the negative, that is, that these presumptions would *not* arise *unless* the State proved beyond a reasonable doubt that defendant *intentionally* shot Miss Lillie.

Defendant's testimony was explicit that he did not intentionally shoot Miss Lillie; that the discharge of his pistol was accidental. If the jury so found, there remained sufficient evi-

dence unfavorable to defendant to require instructions as to involuntary manslaughter and to support a verdict of guilty of involuntary manslaughter.

The following statement from *State v. Hovis,* 233 N.C. 359, 365, 64 S.E. 2d 564, 567-68 (1951), quoted in *State v. Foust,* 258 N.C. 453, 458-59, 128 S.E. 2d 889, 893 (1963), summarizes the legal principles applicable to the factual situation under consideration as follows:

". . . Where one engages in an unlawful and dangerous act, such as 'fooling with an old gun,' *i.e.,* using a loaded pistol in a careless and reckless manner, or pointing it at another, and kills the other by accident, he would be guilty of an unlawful homicide or manslaughter. G.S. 14-34; *S. v. Vines,* 93 N.C. 493; *S. v. Trollinger,* 162 N.C. 618, 77 S.E. 957; *S. v. Limerick,* 146 N.C. 649, 61 S.E. 568.

"Involuntary manslaughter has been defined to be, 'Where death results unintentionally, so far as the defendant is concerned, from an unlawful act on his part not amounting to a felony, or from a lawful act negligently done.' [Citations.]"

[2]  At common law and under G.S. 14-18, "one who points a loaded gun at another, though without intention of discharging it, if the gun goes off accidentally and kills," commits manslaughter. *State v. Coble,* 177 N.C. 588, 591, 99 S.E. 339, 341 (1919) ; *State v. Boldin,* 227 N.C. 594, 42 S.E. 2d 897 (1947).

[3]  Based on legal principles stated above, which are restated and applied in *State v. Foust, supra,* and in *State v. Wrenn, ante,* 676, 185 S.E. 2d 129 (1971), we hold the evidence required the submission under appropriate instructions whether defendant was guilty of involuntary manslaughter.

As stated by Chief Justice Stacy in *State v. DeGraffenreid,* 223 N.C. 461, 463-64, 27 S.E. 2d 130, 132 (1943) : "[T]he defendant is entitled to have the different views presented to the jury, under a proper charge, and an error in respect of the lesser offense is not cured by a verdict convicting the defendant of a higher offense charged in the bill of indictment, for in such case it cannot be known whether the jury would have convicted of a lesser degree of the same crime if the different views, arising on the evidence, had been correctly presented by the trial

court." Accord, *State v. Moore,* 275 N.C. 198, 211-12, 166 S.E. 2d 652, 661 (1969), and cases cited; *State v. Wrenn, supra.* The failure of the court to instruct the jury with reference to involuntary manslaughter and to submit to the jury whether defendant was guilty of involuntary manslaughter entitles defendant to a new trial.

Nothing stated herein is intended to affect defendant's contention that the circumstances under which he drew his pistol were such that this action was or appeared to be necessary to protect himself from death or great bodily harm.

[4] On cross-examination, the solicitor asked defendant if he had not been indicted for murder in New York State. Defendant's objection was overruled. Answering, defendant testified that he had been indicted for murder in New York State in 1964 but "wasn't found guilty" and "wasn't sentenced for it." Defendant's Assignment of Error No. 6 is based on his exception to the admission of this testimony.

The ruling of the trial judge was based on *State v. Maslin,* 195 N.C. 537, 143 S.E. 3 (1928), and decisions in accord with *Maslin,* which, in respect of the point now under consideration, have been overruled this day in *State v. Williams, ante,* 663, 185 S.E. 2d 174 (1971), for reasons fully stated therein.

Defendant, on trial for murder, offered evidence and contended that the discharge of the pistol was accidental and not intentional. Under these circumstances, the admission of the testimony, for the purposes of impeachment, to the effect that he had been indicted in New York State in 1964 for murder was prejudicial.

For the reasons stated, defendant is entitled to a new trial; the case is remanded for trial to determine whether defendant be guilty of voluntary manslaughter, or guilty of involuntary manslaughter, or not guilty.

New trial.