STATE OF NORTH CAROLINA v. FAYE MARIE DAVIS

No. 7219SC407

(Filed 2 August 1972)

1. Homicide § 6— involuntary manslaughter — elements

Involuntary manslaughter is the unlawful killing of a human being without malice, without premeditation and deliberation, and without intention to kill or inflict serious bodily injury.

2. Homicide § 30— failure to charge on involuntary manslaughter — prejudicial error

In an action where defendant was tried for second degree murder or manslaughter, the trial court committed prejudicial error in

State v. Davis

not giving the jury instructions with respect to involuntary manslaughter since defendant's testimony was replete with evidence that she unintentionally shot deceased and that the pistol discharged accidentally.

APPEAL by defendant from *Chess, Judge,* 31 January 1972 Session of Superior Court, RANDOLPH County.

The defendant, Faye Marie Davis, was indicted for the murder of James Charlie Crump (hereinafter referred to as Jimmy) on 5 August 1971 and tried thereon for murder in the second degree or manslaughter. It was stipulated by all counsel in open court that Jimmy's death was "the sole, direct, and proximate result of a gunshot wound."

The State's evidence as presented by the investigating police officers tends to show that the defendant and Jimmy lived together though not lawfully married and that they had five children. Jimmy was much larger than defendant, being five feet nine or ten inches tall and weighing approximately 165 to 175 pounds. Jimmy's reputation in the community was not good. He had been known to drink in excess, to be a "troublemaker," to be violent towards defendant and to have previously beaten her.

The police received a call reporting the shooting at about 9:55 p.m. and found Jimmy lying in the yard of defendant's grandmother with a small wound in the left side of his head. He died shortly thereafter. Defendant was taken to the Randolph County jail where she made a handwritten statement after having been fully advised of her constitutional rights. That statement reads as follows:

"I was in the cafe when Jimmy came in. I was eating hamburger and drinking a soda, and Jimmy said, 'Let's go,' and I said, 'wait until I get through,' and he said, 'Let's go now,' and he said, 'You are going now,' so I see he was mad so I got my hamburger and soda and left and said, 'Let's get the kids before we go,' and he said, 'Let's go now,' and I said, 'I'm going to them anyway,' and he started through the path like he was going home and then he turned around and came back where I was and pushed me down and hit me, and I throw up my hands so he won't hit me again, and I was pushing my way up a tree to get up and told him to take care of and leave me alone because

State v. Davis

I didn't want to hurt him, and he was going to hit me again, and I get the gun out of my pocketbook, and he saw the gun and tried to get it and when we were scuffling with the gun, and it went off, and Jimmy and I fell on the ground and then I got up because that I thought that he wasn't shot and was standing on the porch and my sister came out and said he was shot, and I was crying and standing on the porch, waiting for Jimmy to get up and he didn't, and I knew he was shot, and I heard somebody kept saying, throw the shot away, throw the gun away, so I did. Signed, Faye Davis and witnessed by Charles Bulla."

After the State had rested its case, the trial court in its discretion allowed the State to introduce into evidence the testimony of two additional witnesses, Ronald Matthews and Steve Fair. Matthews's testimony tended to show that he was beside the cafe on the night of the shooting and saw defendant pull her hand out of the pocketbook after she refused to go with Jimmy. Jimmy kept walking toward her with his hand out and when he stopped, defendant said, "I'm not going." Jimmy "reached to grab her arm, and she pulled her hand out of the pocketbook and just shot him. There was no tussel over the gun, but when he fell, he fell directly on her, and that is the reason she fell. . . . There was not a scuffle for this gun between Faye and Jimmy. She pulled it out of her pocketbook. He didn't grab her arm but he was going towards her arm, but she shot him as quick as she pulled out the gun. He didn't grab her . . ."

Fair's testimony tended to show that he was sitting in the cafe on the night of the shooting and left when defendant and Jimmy did. Fair testified that he didn't see Jimmy hit defendant nor any "fussing or anything," but that he just heard a shot and didn't see anybody shoot. "About the time the ambulance came, Faye said, 'I told the S.O.B. not to mess with me.' She said, 'I told the son of a bitch not to mess with me.' About that time her sister, Clara Johnson, came out the door. Faye said something to me about, you'll get the same thing, and I turned around and we left and that was it."

Defendant testified in her own behalf that Jimmy was drinking when he came into the cafe to get her and that she was afraid of him. Upon leaving the cafe, defendant got away from Jimmy but he caught her by the tree, pushed her and she fell

against the tree. "Then he began to cuss me while I was pushing myself up from the tree. That is when I got the gun out of my pocketbook. I told him to go away and leave me alone because I didn't want to hurt him. Then he started at me and we started fumbling with the gun and he was trying to get it away from me. The gun went off. I did not intend to shoot him." Defendant testified that when the gun went off, Jimmy fell on top of her but that she didn't think he had been shot because he tried to get up. When Jimmy tried to get up, defendant ran.

Defendant's evidence further tends to show that for the past two years Jimmy would get drunk and beat her every weekend, and that she had been to a doctor and to the hospital as a result of these beatings. Even though Jimmy mistreated defendant, she continued to live with him because ". . . I didn't have any other place to stay." Defendant repeatedly testified that she never intended to shoot and kill Jimmy. "I was scared of him. I wasn't really mad at him. I didn't intend to shoot him. I thought if he saw the gun he'd leave me alone. I was just going to bluff him. That's all. I ended up shooting him. . . . I just wanted to scare him so he'd leave me alone. I pulled the gun out of my handbag so he wouldn't bother me. . . ." Defendant's evidence also tends to show that she never made any statement in the presence of Steve Fair that she was going to kill Jimmy nor did she say anything to her sister to that effect on the night of the shooting or at any other time. "I did not intend to shoot Jimmy Crump. The gun went off by accident. I do not remember pulling the trigger."

Clara Johnson, defendant's sister, gave testimony which substantially corroborated defendant's evidence that she never said anything to Steve Fair.

The jury returned a verdict of guilty of manslaughter, and a judgment imposing a prison sentence of not less than seven nor more than ten years was entered. Defendant excepted and appealed, setting forth numerous assignments of error.

*Attorney General Morgan, by Associate Attorney Ricks, for the State.*

*Bell, Ogburn and Redding, by John N. Ogburn, Jr., for defendant appellant.*

MORRIS, Judge.

Of the seven assignments of error directed towards the trial court's instructions to the jury, this opinion is based upon the failure of the trial tribunal to submit involuntary manslaughter as a permissible verdict. The trial court instructed the jury they could return a verdict of guilty of murder in the second degree, or a verdict of guilty of voluntary manslaughter, or a verdict of not guilty. Voluntary manslaughter is the unlawful killing of a human being without malice, premeditation or deliberation. *State v. Rummage,* 280 N.C. 51, 185 S.E. 2d 221 (1971), and cases cited therein. Some of the record evidence tends to show that the killing was *intentional* and a charge upon voluntary manslaughter was justified either upon the theory that defendant shot Jimmy in the heat of passion or that she used excessive force in the exercise of her right of self-defense. See Justice Sharp's dissenting opinion in *State v. Wrenn,* 279 N.C. 676, 687, 185 S.E. 2d 129 (1971).

[1, 2] "Involuntary manslaughter is the unlawful killing of a human being without malice, without premeditation and deliberation, *and without intention to kill or inflict serious bodily injury. . . .*" (Citations omitted.) *State v. Wrenn, supra,* at p. 682. Defendant's testimony is replete with evidence that she *unintentionally* shot Jimmy and that the discharge of the pistol was accidental. "It seems that, with few exceptions, it may be said that every unintentional killing of a human being proximately caused by a wanton or reckless use of firearms, in the absence of intent to discharge the weapon, or in the belief that it is not loaded, and under circumstances not evidencing a heart devoid of a sense of social duty, is involuntary manslaughter. . . ." (Citations omitted.) *State v. Foust,* 258 N.C. 453, 459, 128 S.E. 2d 889 (1963). We hold that the evidence offered by defendant, if believed by the jury, is sufficient to support a verdict of involuntary manslaughter. *State v. Lilley,* 3 N.C. App. 276, 164 S.E. 2d 498 (1968) ; *State v. Batts,* 8 N.C. App. 551, 174 S.E. 2d 704 (1970). The failure to submit appropriate instructions as to a lesser degree of the crime charged in the bill of indictment was erroneous and so prejudicial as to require a new trial. *State v. Stimpson,* 279 N.C. 716, 185 S.E. 2d 168 (1971) ; *State v. Wrenn, supra.*

Because a new trial will be required, discussion of defendant's remaining assignments of error is deemed unnecessary.

New trial.

Judges VAUGHN and GRAHAM concur.