STATE OF NORTH CAROLINA v. JAMES BARRY HAITH

No. 8018SC105

(Filed 19 August 1980)

1. **Homicide § 30.3– failure to instruct on involuntary manslaughter**

   The trial court in a murder prosecution did not err in failing to instruct the jury on involuntary manslaughter where all the evidence showed that defendant deliberately pointed a gun toward decedent or at least in the direction of decedent's feet and that defendant intended to pull the trigger when he shot deceased.

2. **Criminal Law § 86.5– impeachment of defendant – cross-examination about marijuana found on his person**

   The trial court in a homicide case did not err in permitting the district attorney to cross-examine defendant for impeachment purposes concerning a bag of marijuana found on defendant's person at the time of his arrest.

3. **Criminal Law § 89.2– uncorroborative testimony – no prejudice**

   Even if an officer's testimony as to certain statements made to him by a witness did not actually corroborate the witness, defendant was not prejudiced thereby where defendant and other witnesses testified to the same information contained in the statements and where the statements corroborated the testimony of a second witness.

4. **Constitutional Law § 74; Criminal Law § 48– impeachment of defendant – failure to tell officers he acted in self-defense**

   The prosecutor's impeachment of defendant by cross-examining defendant about his failure to tell officers, while making an in-custody statement, that he was acting to protect himself from attack by deceased when he shot deceased did not violate defendant's rights under the Fifth or Fourteenth Amendments to the U.S. Constitution or Art. I, §§ 19 or 23 of the N.C. Constitution.

APPEAL by defendant from *Seay, Judge*. Judgment entered 30 August 1979 in Superior Court, GUILFORD County. Heard in the Court of Appeals 4 June 1980.

Defendant James Barry Haith was indicted for first-degree murder of Johnny A. Shoffner on 10 February 1979. The jury returned a verdict of second-degree murder. Defendant was sentenced to not less than twenty-five (25) nor more than thirty (30) years in the State prison.

STATE'S EVIDENCE

At trial the State first presented the testimony of Denise Haith, aged 25, defendant's sister and the deceased's girl friend. She testified that on 10 February 1979, she was living with Johnny Shoffner, the deceased, at the Bethel Apartments in Gibsonville. On the evening of said date she and deceased were physically fighting in the upstairs bedroom, and she had deceased down on the floor by his hair. Lisa Summers came upstairs and Denise let go of Johnny's hair. Denise went downstairs but later went back up and hid in the bathroom. She heard defendant, her brother, call her name from the foot of the stairs but she did not respond because she was afraid. Defendant then left, and she and the deceased went downstairs. While they were sitting on the couch and no longer arguing, defendant came in again. Defendant was mad and asked deceased why he was beating on her. Ms. Haith then saw her other brother, Walter Lee Haith (hereinafter Lee), coming into the front door with a shotgun. She and a friend pushed him out the door, and the gun went off. Defendant then got the shotgun from Lee, left the apartment and fired it towards the air. She could not see the object at which he was shooting. Lee then retrieved the gun. On cross-examination Ms. Haith testified that on 10 February 1979 the deceased and several friends started drinking alcohol at 10:00 a.m. and drank for an hour. Deceased then went to bed until 4:00 p.m. and started drinking again with his relative, Brian, from 7:30 p.m. until 10:30 p.m. She further testified that she never heard defendant threaten the deceased and that she never saw defendant with a pistol. The deceased, however, had beaten her a number of times, and on that evening she pulled a knife on him in the kitchen, because she knew he was mad and had an "attitude." Deceased had broken a lamp while chasing her and thereby frightened the Summers girls who were in the apartment. She did not invite either of her brothers to her apartment that day.

Lisa Summers, aged 16, testified that she lives at the Bethel Apartments. At 8:00 p.m. on 10 February 1979, she visited Ms. Haith's apartment. While she was there, Ms. Haith and deceased started fighting; the deceased called her a "m____f____b____," and the deceased threatened to kill her several times. They had a "scuffle" over a knife that Ms. Haith had wrapped in a towel. Ashtrays, a lamp, and a chair

State v. Haith

were broken. Ms. Summers then went home and saw the defendant at her house. She told defendant that his sister and the deceased were fighting. Defendant then walked over to his sister's house and called her. He then left and returned about 10 minutes later with his brother Lee. She helped Ms. Haith shove Lee out the door when he tried to enter with a shotgun. When they pushed him, the gun went off. Defendant appeared completely sober on said evening.

Jill Summers, aged 19, testified that she was at Ms. Haith's apartment when defendant and Lee entered. She heard a gun go off outside and told deceased to leave by way of the back door. She then saw defendant enter and exit through the front door with the shotgun. She then heard the shotgun a second time. On cross-examination she testified that defendant was never in the deceased's presence in the apartment with a shotgun because the deceased had left with no shirt on. Defendant never threatened the deceased.

David Holt, a resident of Bethel Apartments, testified that on the evening of 10 February 1979 he heard a gunshot, looked out his window but didn't see anything; he put on his clothes, walked out the front door, and, after a few minutes, he saw the defendant run in and out of his brother's house. When defendant came out, the deceased started running toward the road. The defendant started running behind him. The deceased slipped twice and then fell down. One of deceased's shoes came off. The deceased then held his hand up and said, "Man, you got me. I ain't got nothing." The defendant pointed the gun at deceased's back and clicked the gun twice. The third time he clicked the gun, it went off. The defendant then returned to his apartment.

George Foust testified that he lives close to the apartments. On the night in question he also saw the defendant shoot the deceased as the deceased was running from him. Deceased "threw up his arms, kneeled down and then he fell back in the snow."

Officer Bruce Hutchins of the Gibsonville Police Department testified that he arrived at the apartments at 8:20 p.m. on

10 February 1979. He observed the deceased lying on his back in the street. At the scene Foust told him that defendant had shot the deceased after the gun had clicked three times.

Dr. Bruce Alexander, a pathologist, testified that he performed an autopsy on deceased on 11 February 1979. In his opinion deceased died from a .22 caliber bullet which pierced his heart and lungs. Deceased's blood alcohol content was equivalent to a .30 reading on a breathalyzer.

Sandra Kay Haith, defendant's niece, aged 15, testified that on the night of 10 February 1979 she was at her grandmother's (defendant's mother) house. Defendant rushed into the house, knocked her 16-year-old brother down, went upstairs, came back down, and rushed out the door. She then saw the deceased about two or three apartments down. The deceased saw defendant and then ran. Defendant started running toward the deceased. The deceased slipped and fell. Defendant then shot deceased after the gun clicked twice. The deceased was on his hands trying to get up and was "sideways" to the defendant when the defendant shot him. The gun was pointed in a downward direction when it went off.

### DEFENDANT'S EVIDENCE

Defendant testified that on the evening in question he went to his sister's apartment and asked deceased why he was beating on his sister. The deceased came towards him muttering. Lee then entered the apartment with a shotgun, and deceased left. Defendant then left the apartment and started walking towards his own apartment. The deceased started running towards him and threatening to get him. Defendant ran into his apartment, obtained a revolver and then left his apartment to "get his fiancee" who was at another apartment. When he exited his apartment, he saw deceased at least two apartments down. The deceased stated, "I'm going to get you." He then started coming towards defendant. Defendant pulled his revolver out, clicked it twice and then fired downward as deceased was attempting to get up from the icy street about five steps away. The deceased had been coming towards him and was trying to turn but had slipped when the shot was fired.

Defendant fired the gun because he was "scared" for his life; he had no intent to kill decedent. Later in the evening defendant was arrested and gave a written statement to the police.

Defendant also presented the testimony of eight people who testified as to defendant's excellent character and reputation in the community.

Other necessary facts will be stated in the opinion.

*Attorney General Edmisten by Special Deputy Attorney General Charles J. Murray for the State.*

*Public Defender Wallace C. Harrelson for defendant appellant.*

CLARK, Judge.

[1]    Defendant's first assignment of error is that the court erred in failing to charge the jury that they could find the defendant guilty of involuntary manslaughter. In *State v. Wrenn*, 279 N.C. 676, 681, 185 S.E. 2d 129, 132 (1971), Mr. Justice Huskins, writing for the Court, explained:

> "Where, under the bill of indictment, it is permissible to convict defendant of a lesser degree of the crime charged, and there is evidence to support a milder verdict, defendant is entitled to have the different permissible verdicts arising on the evidence presented to the jury under proper instructions. [Citations omitted.] Erroneous failure to submit the question of defendant's guilt of lesser degrees of the same crime is not cured by a verdict of guilty of the offense charged because, in such case, it cannot be known whether the jury would have convicted of a lesser degree if the different permissible degrees arising on the evidence had been correctly presented in the court's charge. . . ."

Our task, then, is to determine whether the evidence would support a charge on involuntary manslaughter. "Involuntary manslaughter is the unlawful killing of a human being without malice, without premeditation and deliberation, *and without*

*intention to kill or inflict serious bodily injury." State v. Wrenn, supra,* 279 N.C. at 682, 185 S.E. 2d at 182. "[O]ne who points a loaded gun at another, though without intention of discharging it, if the gun goes off accidentally and kills," commits involuntary manslaughter. *State v. Coble,* 177 N.C. 588, 591, 99 S.E. 339, 341 (1919); *State v. Boldin,* 227 N.C. 594, 42 S.E. 2d 897 (1947). Similarly, "'[w]here one engages in an unlawful and dangerous act, such as "fooling with an old gun," *i.e.,* using a loaded pistol in a careless and reckless manner, or pointing it at another, and kills the other by accident, he would be guilty of an unlawful homicide or manslaughter. (Citations omitted)'" *State v. Stimpson,* 279 N.C. 716, 724, 185 S.E. 2d 168, 173 (1971).

Defendant cites the following testimony by defendant as evidence that the firing of the gun by defendant was without intention to kill or without intention to inflict serious bodily injury:

"I got a weapon because I was going back over to get my fiancee."

"Well, as I clicked it, he must have realized I had it because he tried to run back and that's when he slipped and the revolver went off."

"I fired this gun because I was scared for my life. I did not have any intention of killing Johnny Shoffner. I fired the shot downward."

"I am telling this Court and this jury that I was afraid of Johnny Shoffner. I didn't stay home because I went to get my fiancee."

"When I got outside I intended to go over to Deedee's. I didn't go because he was coming at me."

"No, I didn't aim right at him. I aimed downward. It was done more or less at his legs and the concrete."

The State, on the other hand, argues that, by taking excerpts from the defendant's testimony out of context, the defendant attempts to establish that there is evidence to show that

the defendant did not intentionally pull the trigger, that it was an accident, or that he did not aim at the victim. The State argues that the defendant's own evidence shows that he intentionally pulled the trigger of the revolver and at the very least he aimed the revolver at the victim's legs thereby intending to inflict serious bodily injury. In addition, the State emphasizes the following testimony by defendant:

"I did not shoot the man after he had turned and was leaving and running from me. I shot him, and he was coming towards me when he slipped on the ice. He was still in pursuit of coming to me. Yes, he was in pursuit of coming to me. Yes, coming right at me. He fell down, fell forward. And that's when *I shot him. I tried to shoot him* the first time when he was about four steps from my door. I am telling this Court and this jury that *I shot and killed Johnny Shoffner* about a half door down in front of my front door. ..." (Emphasis supplied.)

Earlier in his testimony, defendant also stated:

"When he got about five or steps away, at that position, he was more or less left and off balance because he couldn't get his foot —. At the time he was going to get me, that's when I took out the revolver. I took out the revolver. The revolver was pointed down where — it was at a level of my waist. I had pulled it out and I had it right up in here. *I clicked it twice. Well, as I clicked it, he must have realized I had it because he tried to run back and that's when he slipped* and the revolver went off. *I pulled the revolver three times.* To show His Honor and the members of the jury what position he was in at the time *I fired the third shot* when it went off, he was more or less — he was trying to turn but he slipped on the ice. ..." [Emphasis supplied.]

We agree with the State. In this case there is no evidence that the defendant did not intend to pull the trigger. In fact, he intended to pull the trigger three times. Furthermore, defendant deliberately pointed the gun at the deceased, at the very least, in the direction of deceased's legs. This is not the case where, for example, the gun went off while the defendant and

victim were fumbling with the gun, *State v. Davis*, 15 N.C. App. 395, 190 S.E. 2d 434 (1972); where the gun went off when the deceased grabbed a gun lying across defendant's knees, *State v. Foust*, 258 N.C. 453, 128 S.E. 2d 889 (1963); where the defendant threw up a gun and it went off, *State v. Graham*, 38 N.C. App. 86, 247 S.E. 2d 300 (1978); or where the defendant "fired his pistol *away from*" the deceased and did not intend to "shoot at, near, or *in the direction of the deceased,*" *State v. Ward*, 300 N.C. 150, 155-56, 266 S.E. 2d 581, 585 (1980). (Emphasis added in second quotation.) This assignment of error is overruled.

[2]  Defendant's next argument is that the trial court erred in allowing the District Attorney to cross-examine him concerning a bag of marijuana allegedly found on defendant's person at the time of his arrest. We do not agree. "A defendant who elects to testify in his own behalf surrenders his privilege against self-incrimination and knows he is subject to impeachment by questions relating to specific acts of criminal and degrading conduct. Such cross-examination for impeachment purposes is not limited to conviction of crimes but encompasses any act of the witness which tends to impeach his character. (Citations omitted.)" *State v. McKenna*, 289 N.C. 668, 684, 224 S.E. 2d 537, 548 (1976). The marijuana was properly introduced for impeachment purposes.

[3]  The defendant next contends that the trial court erred in allowing testimony for corroborative purposes when it did not corroborate the witnesses or their testimony and was highly prejudicial. In this argument defendant refers to the testimony of Officer Hutchins that related to an out-of-court statement by a previous State witness, George Foust. In particular, defendant objects to the officer's statement that Mr. Foust told him that he heard the gun click three times, and that the deceased threw his hands up in the air and said, "You've got me, man, I don't have a gun." Officer Hutchins also stated that Foust had told him that "on the fourth time the gun clicked that it discharged." Assuming that this statement was not corroborative, we fail to see how this evidence was prejudicial to the defendant since the defendant himself said that he pulled the trigger three times, as did defendant's niece and Foust. Similarly, while it is true that Foust did not testify on direct examination

as to what the deceased said when he threw up his hands, David Holt did so testify, and since Holt was impeached by defendant, the fact that Foust had repeated the same statement to Officer Hutchins would be corroborative of Holt's statement. Furthermore, given the strength of the State's case, with three eyewitnesses, we fail to see how the trial court's error, if any, would change the outcome of defendant's trial. N.C. Gen. Stat. § 15A-1433(a).

[4] The final argument presented by defendant is that the trial court erred in allowing the District Attorney to cross-examine the defendant as to whether he told the officer, while making a statement in custody, that he was acting to protect himself from attack by the deceased. That statement by defendant provides in relevant part:

"Johnny came from around the corner saying he was going to get me. I then went into the house and got a .22 caliber pistol and came back out. He, Johnny, kept on running his mouth about he was going to get me, and he took off running and I shot at him one time and that was it. I then went back into the house. This statement is of my own free will and I have been advised of my rights, and I understand them. No pressure or coercion of any kind has been used against me."

This statement was prepared by Detective D.L. DeBerry, was witnessed by Officers DeBerry and Summers, and was initialed and signed by the defendant. At trial, while cross-examining the defendant, the prosecutor attempted to impeach defendant by asking the following questions concerning his statement:

"Q. Didn't say anything at all to the officers about calling out or going back over there because you were concerned about her welfare?

Mr. Harrelson: Objection.

The Court: Overruled.

A. No, sir.

Q. You didn't say a word about Johnny Shoffner coming at you, did you?

A. I don't remember.

\* \* \* \*

Q. You never told either of these officers investigating this crime that you shot this man in self-defense while you were in fear for your life, did you?

A. I don't remember."

There is no doubt that the questions submitted by the prosecutor do not violate the Fifth or Fourteenth Amendments to the United States Constitution. Very recently, in *Jenkins v. Anderson,*____U.S.____(No. 78-6809), (Filed 10 June 1980), 48 U.S.L.W. 4693, 4696, 40 C.C.H. S. Ct. Bull. B2837, B2847, the United States Supreme Court held that "[t]he use of prearrest silence to impeach a defendant's credibility does not violate the Constitution." The majority opinion, however, explicitly noted that it did "not force any state court to allow impeachment through the use of prearrest silence." *Id.* We hold that under the facts of this case that the above questions proffered by the prosecutor also do not violate Article I, Sections 19 or 23 of the North Carolina Constitution. We note that defendant not only waived his right to remain silent by making a statement to the police officers while he was in custody and after he had been informed of his rights, but also chose to take the stand at trial and to testify in his behalf. We emphasize that we do not reach the determination of whether the North Carolina Constitution would permit questioning as to prearrest silence in the fact situation presented in *Jenkins, supra. See, e.g., State v. McCall,* 286 N.C. 472, 482-487, 212 S.E. 2d 132, 138-141 (1975), and *State v. Castor,* 285 N.C. 286, 204 S.E. 2d 848 (1974). Similarly, for the reasons expressed by the dissents of Mr. Justice Marshall and Mr. Justice Brennan in *Jenkins, supra,* 48 U.S.L.W. at 4697, we expressly refuse to hold that the North Carolina Constitution will permit, under all circumstances, that a criminal defendant who testifies in his own behalf may be impeached by some form of his prearrest silence.

No error.

Chief Judge MORRIS and Judge ERWIN concur.